[No. S040008. Dec. 9, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD D. PRETTYMAN et al., Defendants and Appellants.

**COUNSEL**

George L. Schraer and Neil Auwarter, under appointments by the Supreme Court, for Defendants and Appellants.

Francis J. Bardsley, Public Defender (San Diego), Jacqueline C. Crowle, Deputy Alternate Public Defender, Riordan & Rosenthal, Dennis P. Riordan and Dylan L. Schaffer as Amici Curiae on behalf of Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert B. Shaw, Janelle B. Davis and Nancy L. Palmieri, Deputy Attorneys General, for Plaintiff and Respondent.

John J. Meehan, District Attorney (Alameda) and William M. Baldwin, Assistant District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—Under California law, a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a "natural and probable consequence" of the crime originally aided and abetted. To convict a defendant of a nontarget crime as an accomplice under the "natural and probable consequences" doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the commission of the target crime. The jury must also find that the defendant's confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a "natural and probable consequence" of the target crime that the defendant assisted or encouraged.

In this case, defendant Debra Jane Bray was charged with the crime of murder; the prosecution's theory at trial was that she was guilty as an accomplice. The trial court instructed the jury that it could find Bray guilty of murder if it determined either that she had aided and abetted the murder or that the murder was a "natural and probable consequence" of any uncharged offense(s) that Bray had aided and abetted. The court did not, however, identify or describe any such uncharged target offense. At issue here is whether, absent a request by counsel, the court should have so instructed the jury.

We conclude that when the prosecutor relies on the "natural and probable consequences" doctrine, the trial court must identify and describe the target crimes that the defendant might have assisted or encouraged. An instruction *identifying* target crimes will assist the jury in determining whether the crime charged was a natural and probable consequence of some other criminal act. And an instruction *describing* the target crimes will eliminate the risk that the jury will engage in uninformed speculation with regard to what types of conduct are criminal.

## I. *Facts*

Codefendant Richard D. Prettyman and defendant Debra Jane Bray were charged with the murder of Gaylord "Vance" Van Camp (Pen. Code, § 187; all subsequent statutory references are to the Penal Code), and with conspiring to murder Van Camp (§ 182). A jury convicted both of first degree

murder, but acquitted them of conspiracy.[1] The following evidence was presented at their trial.

Defendant Bray and codefendant Prettyman held themselves out as husband and wife. They, as well as victim Van Camp, were among the homeless living in the Pacific Beach area of San Diego. Van Camp was beaten to death with a steel pipe on the morning of July 20, 1992, while asleep in the courtyard of the Pacific Beach Presbyterian Church. The prosecution contended that Prettyman beat Van Camp to death with the pipe, and that Bray, described by the prosecutor as an "argumentative drunk," encouraged Prettyman to kill Van Camp in order to obtain Bray's wallet, which Bray had given to Van Camp for safekeeping the previous evening.

On the evening preceding the murder, defendant Bray and Van Camp had dinner at the church. Codefendant Prettyman was not present during the dinner, but he attended the religious service that followed. After the service, Bray, who was intoxicated, argued with Prettyman. According to prosecution witness Dennis Charette, a homeless man who observed the argument, Bray demanded that Prettyman return to her certain identification papers that she needed to collect a benefit check. When the argument became heated, Van Camp asked the church's preschool director, Stephanie Hansen, to intervene. At trial, Hansen mentioned that it was "pretty common" for the "street people" she knew to argue and to threaten one another, and that she had heard Bray arguing with Prettyman on other occasions.

After talking to Bray and Prettyman, Hansen asked Van Camp to take Prettyman away from the church until the latter had calmed down. The two men left. Before they went, Bray handed her wallet to Van Camp. According to Charette, Bray told Van Camp to hold the wallet for safekeeping, to prevent Prettyman from stealing it.

Prettyman and Van Camp returned to the church courtyard. Prettyman lay down next to Bray, while Van Camp found a sleeping spot a short distance away. When Charette got up at 2 a.m. to urinate, he noticed that Bray and Prettyman were gone, but that Van Camp was still asleep in the courtyard.

At 3:00 or 4:00 a.m., Edward Eash, a homeless man sleeping in a car near the church courtyard, was awakened by the sound of loud voices. Looking out a car window, he saw Bray and codefendant Prettyman. Bray repeatedly said: "We are going to get that fucker Vance. He has no idea who he is

---

[1]The Court of Appeal affirmed codefendant Prettyman's murder conviction. We denied Prettyman's petition for review, which challenged his conviction on grounds other than those addressed here.

messing with. He ain't getting away with this shit." Prettyman nodded his head and said, "Yep. Okay."

Between 4:00 and 5:30 a.m., Charette was awakened by the sound of thumping noises in the church courtyard. He heard codefendant Prettyman say, "Take that." Sitting up, Charette saw Prettyman leave the courtyard with a three-to-four-foot pipe. Charette heard Van Camp make "gagging" noises.

Immediately after Prettyman's departure, Bray came "flying up" to Charette. She told him to leave and not to look at Van Camp. Charette obeyed. He later met Bray and Prettyman in front of the church. Prettyman then went back into the church courtyard. He returned within a few minutes, and reported that Van Camp had choked on his own blood. Prettyman then said, "teach him to steal a wallet [and] to threaten us," adding that Van Camp had "deserved it." Both Bray and Prettyman told Charette not to tell anyone what had happened.

Shortly after 6:00 a.m., codefendant Prettyman told Robert Walker, another homeless man, that he had killed Van Camp with a metal pipe and then had started looking for Bray's wallet. He told Walker that he eventually found the wallet under Van Camp's head.

At 6:30 a.m., preschool director Hansen arrived at the church. She saw a figure lying in the church courtyard and heard a moaning sound, but she did not investigate, assuming that the person was waking up. At 7:20 a.m., the custodian told her there was a dead body in the courtyard, and she called the police.

When police officers arrived, they saw Van Camp's body lying in the courtyard, a bloody jacket next to his head. Papers, items of clothing, and Van Camp's backpack were strewn on the steps to the church sanctuary. The police retrieved a three-foot long piece of galvanized steel pipe from the ivy on church grounds.

Dr. Harry James Bonnell, Chief Deputy Medical Examiner for San Diego County, testified that Van Camp's death was caused by three blows to the head from a blunt instrument, and that the blows could have been inflicted by the steel pipe that the police had found on the church grounds. The pipe had no bloodstains or fingerprints. Dr. Bonnell stated that if some garment had covered Van Camp's head when the fatal blows were struck, this might explain the absence of bloodstains on the pipe. According to prosecution witness Dennis Charette, Van Camp customarily covered his head with his coat before going to sleep in the church courtyard.

Both defendant Bray and codefendant Prettyman attempted to show that someone other than Prettyman had killed Van Camp. The chief defense witness was Charles Dunner, a homeless man. Between 12:00 and 1:30 on the night of the killing, Dunner was "dumpster diving" in an alley across the street from the Pacific Beach Presbyterian Church. As he left the alley, he saw a car with two occupants. A Hispanic man with a beard and slick hair got out of the car and ran into the church courtyard, carrying a bat or club. After looking around, the man repeatedly hit someone or something with the club. Dunner could not see what the man was hitting because his view was partially obstructed by a planter box. The man then returned to the car, got in, threw the club in the back seat, and the car took off. The defense also called Summer Boyd, a licensed vocational nurse. She testified that she attended a meeting at the Pacific Beach Presbyterian Church on the morning that Van Camp was killed, arriving about 7:10 a.m. During the meeting, at 7:17 a.m., she heard some men shouting, "Let's get out of here, they are coming." She then saw two Hispanic men and one White male with long scraggly light-brown hair run down the alley next to the church.

The defense also presented expert testimony. David Fortman, a defense investigator who had taught courses in forensics, blood spatter evidence, and criminology, testified that, based on blood spatters photographed at the scene, significant quantities of blood must have been transferred to the murder weapon when it was used to strike the fatal blows to Van Camp's head. Because the steel pipe found by police bore no bloodstains and was dirty (indicating that it had not been washed), Fortman concluded that the pipe was not the murder weapon.

In an effort to impeach prosecution witnesses Charette and Eash, the defense presented evidence that Charette was "extremely intoxicated" on the night Van Camp was killed and that Eash, who had testified he was sober on the night of the murder, was a convicted felon, had a drinking problem, and once had given a written report to his probation officer falsely stating that he had not been arrested for alcohol-related offenses during the month preceding the report.

The trial court gave the jury the standard instructions defining aiding and abetting: CALJIC No. 3.00 (5th ed., 1988; unless otherwise stated, all subsequent CALJIC citations are to the 5th edition) (principals defined), CALJIC No. 3.01 (aiding and abetting defined), and CALJIC No. 3.03 (termination of liability of one who aids and abets). Also included was this instruction: "One who aids and abets is not only guilty of the particular crime aided and abetted, but is also liable for the *natural and probable consequences* of the commission of such crime. You must determine whether

the defendant is guilty of the crime originally contemplated, and, if so, whether any other crime charged was a natural and probable consequence of such *originally contemplated* crime." (Italics added.) This instruction was substantially similar to the original (1988) version of CALJIC No. 3.02.[2] The trial court did not give the 1992 revision of CALJIC No. 3.02, which would have specified the possible criminal acts that Bray might have "originally contemplated," nor did the trial court give an instruction describing the elements of any such crimes.[3] Although the record is unclear, the instruction on the "natural and probable consequences" rule was apparently given by the trial court on its own initiative.

As previously mentioned, the jury convicted both defendant Bray and her confederate, codefendant Prettyman, of first degree murder, but acquitted them of conspiracy to commit murder. The trial court sentenced Bray to a term of 25 years to life in prison. She appealed. (As stated in fn. 1, *ante,* Prettyman also appealed, but on different grounds.)

The Court of Appeal affirmed Bray's conviction. It held that the trial court had properly instructed the jury on aiding and abetting, rejecting Bray's contention that the trial court had erred in neither identifying nor describing any target or predicate crime that she might have "originally contemplated" within the meaning of CALJIC No. 3.02. The court, however, noted the disagreement in the Courts of Appeal regarding the need to so instruct the jury: *People* v. *Mouton* (1993) 15 Cal.App.4th 1313 [19 Cal.Rptr.2d 423] held that a trial court must name and define any target or predicate offense that the accomplice might originally have assisted or encouraged. In contrast, *People* v. *Solis* (1993) 20 Cal.App.4th 264 [25 Cal.Rptr.2d 184], expressly disagreeing with *Mouton*, held that such instructions are generally

---

[2] The 1988 version of CALJIC No. 3.02 stated: "One who aids and abets is not only guilty of the particular crime that to [his] [her] knowledge [his] [her] confederates are contemplating committing, but [he] [she] is also liable for the natural and probable consequences of any criminal act that [he] [she] knowingly and intentionally aided and abetted. You must determine whether the defendant is guilty of the crime originally contemplated, and, if so, whether the crime charged [in Count[s] __] was a natural and probable consequence of such originally contemplated crime." Although in this case the instruction that the trial court gave (quoted in the text) is not identical to the instruction just quoted, the parties do not suggest that the differences affect the outcome of this case.

[3] The 1992 revision of CALJIC No. 3.02 reads: "One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [that crime] [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. [¶] In order to find the defendant guilty of the crime[s] of ___, [as charged in Count[s] __,] you must be satisfied beyond a reasonable doubt that: [¶] (1) The crime [or crimes] of ___ [was] [were] committed, [¶] (2) The defendant aided and abetted such crime[s], [¶] (3) A co-principal in such crime committed the crime[s] of ___, and [¶] (4) The crime[s] of ___ was a natural and probable consequence of the commission of the crime[s] of ___."

unnecessary. To resolve this conflict, we granted defendant Bray's petition for review.

## II. *General Principles of Aiding and Abetting Liability*

Under California law, a person who aids and abets the commission of a crime is a "principal" in the crime, and thus shares the guilt of the actual perpetrator. (§ 31.)

Accomplice liability is "derivative," that is, it results from an act by the perpetrator to which the accomplice contributed. (See Kadish, *Complicity, Cause and Blame: A Study in the Interpretation of Doctrine* (1985) 73 Cal.L.Rev. 323, 337.) "[W]hen an accomplice chooses to become a part of the criminal activity of another, she says in essence, 'your acts are my acts,' and forfeits her personal identity. We euphemistically may impute the actions of the perpetrator to the accomplice by 'agency' doctrine; in reality, we demand that she who chooses to aid in a crime forfeits her right to be treated as an individual." (Dressler, *Reassessing the Theoretical Underpinnings of Accomplice Liability: New Solutions to an Old Problem* (1985) 37 Hastings L.J. 91, 111, fn. omitted.)

In *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], we discussed the mental state necessary for liability as an aider and abettor. To prove that a defendant is an accomplice, we said, the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*Id.* at p. 560, italics in original.) When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Ibid.*) Thus, we held, an aider and abettor is a person who, "acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*Id.* at p. 561.)

It sometimes happens that an accomplice assists or encourages a confederate to commit one crime, and the confederate commits another, more serious crime (the nontarget offense). Whether the accomplice may be held responsible for that nontarget offense turns not only upon a consideration of the general principles of accomplice liability set forth in *People* v. *Beeman*,

*supra*, 35 Cal.3d 547, but also upon a consideration of the "natural and probable consequences" doctrine, which is at issue in this case and will be discussed below.

### III. *The "Natural and Probable Consequences" Doctrine*

At common law, a person encouraging or facilitating the commission of a crime could be held criminally liable not only for that crime, but for any other offense that was a "natural and probable consequence" of the crime aided and abetted. (1 Wharton's Criminal Law (15th ed. 1993) Parties, § 35, p. 207.)

Although the "natural and probable consequences" doctrine has been "subjected to substantial criticism" (Dressler, Understanding Criminal Law (1987) § 30.05, p. 427; see also 2 LaFave & Scott, Substantive Criminal Law (1986) § 6.8, p. 159), it is an "established rule" of American jurisprudence (*id.* at p. 158). It is based on the recognition that "aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion." (*People* v. *Luparello* (1986) 187 Cal.App.3d 410, 439 [231 Cal.Rptr. 832].) The first California decision to embrace this doctrine was *People* v. *Kauffman* (1907) 152 Cal. 331 [92 P. 861].

In *Kauffman*, the defendant and six friends planned to break into a safe at a cemetery. Armed with guns, a bottle of nitroglycerin (to blow open the safe), and burglary tools, they went to the cemetery, where they found an armed guard by the safe. They turned back. On their way home, an encounter with a police officer led to a gunfight in which the officer was killed. The defendant, who had been carrying the nitroglycerin, was unarmed and did not participate in the shooting, but he was charged with and convicted of the officer's murder. (*People* v. *Kauffman, supra*, 152 Cal. at pp. 332-334.) On appeal, the defendant argued that the evidence was insufficient to support his conviction.

In affirming the defendant's conviction in *Kauffman*, this court said: " 'The general rule is well settled that where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. . . . *Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan.* Nevertheless the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection

between them may be reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design.' " (*People* v. *Kauffman, supra,* 152 Cal. at p. 334, italics added, quoting 8 Cyclopedia of Law & Procedure (1903) p. 641.)

We then concluded in *Kauffman* that, based on the evidence presented, the jury could reasonably find that the plan in which the defendant had conspired included not only breaking into the safe at the cemetery, but also protecting all members of the group from arrest or detection while going to and returning from the scene of the proposed burglary, and that the policeman's death was a natural and probable consequence of this unlawful enterprise. (*People* v. *Kauffman, supra,* 152 Cal. at pp. 335-337.)

*People* v. *Kauffman, supra,* 152 Cal. 331, involved the liability of conspirators for substantive crimes in the course of a conspiracy, not the liability of aiders and abettors, as does this case. But later decisions have applied the "natural and probable consequences" doctrine to aiders and abettors (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Beeman, supra,* 35 Cal.3d 547, 560; *People* v. *Durham* (1969) 70 Cal.2d 171, 181-185 [74 Cal.Rptr. 262, 449 P.2d 198]; *People* v. *Bond* (1910) 13 Cal.App. 175 [109 P. 150]) as well as to conspirators (*People* v. *Hardy* (1992) 2 Cal.4th 86, 189 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Price* (1991) 1 Cal.4th 324, 442 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People* v. *Bringhurst* (1923) 192 Cal. 748, 751 [221 P 897]; *People* v. *Creeks* (1915) 170 Cal. 368, 374-375 [149 P. 821]; see CALJIC No. 6.11).

In *People* v. *Croy, supra,* 41 Cal.3d 1, we set forth the principles of the "natural and probable consequences" doctrine as applied to aiders and abettors: "[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. . . . [¶] It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must be found by the jury." (*Id.* at p. 12, fn. 5.) ▉ Thus, under *Croy*, a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the "natural and probable consequence" of the target crime.

As we pointed out earlier, under the general principles of aiding and abetting, "an aider and abettor [must] act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People* v. *Beeman, supra,* 35 Cal.3d at p. 560, italics in original.) Therefore, when a particular aiding and abetting case triggers application of the "natural and probable consequences" doctrine, the *Beeman* test applies, and the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense *other than* the target crime;[4] and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted.

Until quite recently, the decisions involving application of the "natural and probable consequences" doctrine in aiding and abetting situations were limited to a consideration of whether the evidence was sufficient under the doctrine to support the defendant's conviction. These decisions most commonly involved situations in which a defendant assisted or encouraged a confederate to commit an assault with a deadly weapon or with potentially deadly force, and the confederate not only assaulted but also murdered the victim. In those instances, the courts generally had no difficulty in upholding a murder conviction, reasoning that the jury could reasonably conclude that the killing of the victim death was a "natural and probable consequence" of the assault that the defendant aided and abetted. (*People* v. *Martinez* (1966) 239 Cal.App.2d 161 [48 Cal.Rptr. 521]; *People* v. *Cayer* (1951) 102 Cal.App.2d 643 [228 P.2d 70]; *People* v. *Le Grant* (1946) 76 Cal.App.2d 148 [172 P.2d 554]; *People* v. *King* (1938) 30 Cal.App.2d 185 [85 P.2d 928]; *People* v. *Bond, supra,* 13 Cal.App. 175; see also *People* v. *Montano* (1979) 96 Cal.App.3d 221, 226-227 [158 Cal.Rptr. 47] [attempted murder of rival gang member was natural and probable consequence of defendant's suggestion that members of his gang beat up rival gang members]; but see *People* v. *Butts* (1965) 236 Cal.App.2d 817, 836-837 [46 Cal.Rptr. 362] [killing of victim held not to be a natural and probable consequence of an assault when the defendant did not know that his confederate would use a deadly weapon].) Other cases applied the "natural and probable consequences" doctrine in situations where a defendant assisted in the commission of an armed robbery, during which a confederate assaulted or tried to kill one

---

[4]In this case we need not address, and therefore we do not decide, whether a defendant may be convicted under the "natural and probable consequences" doctrine when the target criminal act was not committed.

of the robbery victims. In those cases, courts upheld jury verdicts convicting the defendant of assault and/or attempted murder, on the ground that the jury could reasonably conclude that the crime was a natural and probable consequence of the robbery aided by the defendant. (*People* v. *Rogers* (1985) 172 Cal.App.3d 502 [217 Cal.Rptr. 809]; *People* v. *Fagalilo* (1981) 123 Cal.App.3d 524 [176 Cal.Rptr. 698]; *People* v. *Bradford* (1972) 28 Cal.App.3d 695 [104 Cal.Rptr. 852]; *People* v. *George* (1968) 259 Cal.App.2d 424 [66 Cal.Rptr. 442].)

More recently, the appellate courts have had to deal with questions regarding the adequacy of jury instructions with respect to the "natural and probable consequences" doctrine. This case concerns one such question: whether the trial court should have identified and described the predicate or target offense(s) assisted and encouraged by the defendant.

### IV. *Instructions on the "Natural and Probable Consequences" Doctrine*

In instructing a jury in a criminal case on the applicable law, California trial judges are guided in general by the standard jury instructions contained in California Jury Instructions, Criminal (CALJIC). These are prepared by the Committee on Standard Jury Instructions, Criminal, of the Superior Court of Los Angeles County. Although not mandated by statute, their use is recommended by the Judicial Council of California (Cal. Standards Jud. Admin., § 5).

The pattern instructions on accomplice responsibility in CALJIC's first, second, and third editions (published in 1946, 1958, and 1970, respectively) made no reference to the "natural and probable consequences" doctrine.[5] The rule was first mentioned in a 1976 supplement to the third edition of CALJIC, which suggested, at the end of a pattern instruction defining the "principals" of a crime, this optional instruction: "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged." (CALJIC No. 3.00 (3d ed. 1976 rev.).) This sentence was retained in the fourth edition of CALJIC, which was published in 1979. Then, in 1988, in apparent response to a statement by the Court of Appeal in *People* v. *Hammond* (1986) 181 Cal.App.3d 463, 469 [226 Cal.Rptr. 475], which criticized the instruction as inadequate, the Committee on Standard

---

[5]Early editions of CALJIC did, however, cite the "natural and probable consequences" rule as a principle of conspiracy law. (CALJIC No. 932 (1st ed. 1946); CALJIC No. 932 (2d ed. 1958); CALJIC No. 6.11 (3d ed. 1970).)

Jury Instructions, Criminal drafted a separate new instruction to explain the "natural and probable consequences" doctrine. (CALJIC No. 3.02 (5th ed. 1988).)

The 1988 version of CALJIC No. 3.02 made no mention of *identifying* for the jury any target or predicate unlawful act that had been aided and abetted by the defendant and that led, as a natural and probable consequence, to the confederate's commission of the crime with which the defendant was charged. (See fn. 2, *ante.*) In 1992, however, CALJIC No. 3.02 was revised to include this information. (See fn. 3, *ante.*) And an accompanying "use note" stated: "This instruction must be accompanied by . . . instructions defining all crimes encompassed in this instruction." (CALJIC (5th ed. 1992 pocket pt.) p. 19.)

At issue here is whether, when a trial court instructs a jury on the "natural and probable consequences" doctrine, the identification and description of potential target offenses are "general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case" (*People* v. *Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903]), thus triggering the trial court's duty to so instruct the jury on the court's own initiative. (*Ibid.*; *People* v. *Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197]; *People* v. *Perez* (1992) 2 Cal.4th 1117, 1129 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) This issue first arose in a 1993 decision by the Court of Appeal in *People* v. *Mouton, supra,* 15 Cal.App.4th 1313. In *Mouton,* a man had a fight with his girlfriend. Hearing that the girlfriend's relatives had armed themselves and were looking for him, the man asked the defendant and one Albert Reed to bring their guns to the apartment complex where the altercation had occurred. When the latter two came to the apartment building with guns, one of the residents told them to leave. An argument ensued. Reed then fired three shots at the resident, missing him but killing a bystander.

The defendant in *Mouton* was charged, as an aider and abettor, with murdering the bystander. At trial, the prosecution conceded that the defendant and Reed had not planned to kill the bystander; the prosecution argued, however, that the defendant was nevertheless guilty of the murder as an aider and abettor, because the killing of the bystander was a natural and probable consequence of target crimes whose commission the defendant had intentionally aided and abetted. Among those crimes, the prosecutor contended, were carrying a concealed firearm (§ 12025), brandishing a deadly weapon (§ 417), assault with a deadly weapon (§ 245), and shooting at an occupied dwelling (§ 246). The trial court instructed the jury that the defendant could

be held responsible for any crime that was the "natural and probable consequence" of the unlawful act(s) the defendant had aided and abetted. But, as in this case, the trial court neither identified nor described the target crimes that, under the prosecutor's theory, the defendant facilitated or encouraged and that could have led to the killing. The jury convicted the defendant of second degree murder.

The Court of Appeal in *Mouton* reversed the defendant's murder conviction. It held that the trial court should, on its own initiative, have identified and defined the target offenses that the defendant might originally have aided and abetted, in view of the trial court's general duty "to instruct the jury on all general legal principles raised by the evidence and necessary for the jury's understanding of the case." (*People* v. *Mouton, supra,* 15 Cal.App.4th at p. 1319, citing *People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311].) As a result, the court said, the jury "was left to determine defendant's guilt of the ultimate offense—the charged murder—without guidance concerning the identity or definition of the originally contemplated (or target) offenses . . . ." (*People* v. *Mouton, supra,* 15 Cal.App.4th at p. 1319.)

Six months later, the Court of Appeal in *People* v. *Solis, supra,* 20 Cal.App.4th 264, disagreed with the holding in *People* v. *Mouton, supra,* 15 Cal.App.4th 1313. In *Solis,* the defendant, a juvenile gang member, was challenged to a fight by members of another gang. He retreated but returned later that evening, driving a car containing two passengers, one of whom fired at members of the rival gang, killing one of them. The defendant was charged with murder. As in this case and in *Mouton,* the trial court in *Solis* instructed the jury on the "natural and probable consequences" doctrine, but neither specified nor described the elements of any target or predicate offense that the defendant might have aided or encouraged. (20 Cal.App.4th at p. 276.) The jury convicted the defendant of second degree murder.

In affirming the murder conviction, the court in *Solis* stated: "[T]he finder of fact need identify the nature of the predicate offense only in a generalized manner, reaching a conclusion that some 'criminal' or 'nefarious' conduct was intended by the defendant." (*People* v. *Solis, supra,* 20 Cal.App.4th at p. 273.) Therefore, the court concluded, "it is not necessary to provide instructions as to the possible predicate crimes, which . . . are uncharged and irrelevant to the offense ultimately committed and charged." (*Ibid.*) The *Solis* court acknowledged that "if there is a dispute as to whether the predicate planned acts are criminal, a determination as to the nature of those acts and instruction on the criminal definitional nature of such will be required." (*Id.* at p. 274, fn. 8.) But in the court's view such cases are uncommon, and in the "ordinary case" such an instruction is unnecessary. (*Ibid.*)

### V. Duty of Trial Court to Identify and Describe the Elements of Potential Target Crimes Under the "Natural and Probable Consequences" Doctrine

In this case, defendant Bray, relying on *People v. Mouton, supra,* 15 Cal.App.4th 1313, contends that the trial court should, on its own initiative, have instructed the jury with the 1992 revision to CALJIC No. 3.02, specifying for the jury the target or predicate crime(s) that, under the evidence, Bray might have aided and abetted and that could have led, as a natural and probable consequence, to the murder of Van Camp by codefendant Prettyman. Again relying on *Mouton,* Bray argues that in addition to CALJIC No. 3.02, the court should have given an instruction describing or defining the elements of the target crimes. The Attorney General, relying on *People v. Solis, supra,* 20 Cal.App.4th 264, contends the contrary. We agree with Bray.

Although the issue is one of first impression in this court, instructive here is our decision in *People v. Failla* (1966) 64 Cal.2d 560 [51 Cal.Rptr. 103, 414 P.2d 39]. In *Failla,* the defendant was charged with burglary. The trial court instructed the jury in the language of the statute prohibiting burglary (§ 459), which provides that one who enters a building with the intent to commit theft "or any felony" is guilty of burglary. But the court did not tell the jury what target act(s) the defendant might have intended to commit after entering the building would constitute felonies. We reversed the defendant's burglary conviction, concluding that the trial court committed prejudicial error by failing to give, on its own initiative, an instruction "defining 'felony' and advising the jury which acts the defendant, upon entry, may have intended to commit would amount to felonies." (*People v. Failla, supra,* 64 Cal.2d at p. 564.) We explained: "[W]here the evidence permits an inference that the defendant at the time of entry intended to commit one or more felonies and also an inference that his intent was merely to commit one or more misdemeanors or acts not punishable as crimes, the court must define 'felony' and must instruct the jury which acts, among those which the jury could infer the defendant intended to commit, amount to felonies. Failure to do so is error, for it allows the triers of fact to indulge in unguided speculation as to what kinds of criminal conduct are serious enough to warrant punishment as felonies and incorporation into the burglary statute." (*Ibid.*)

As in *People v. Failla, supra,* 64 Cal.2d 560, the central issue here is whether the trial court must identify and describe uncharged target offenses for the jury. As in *Failla,* we conclude that such an instruction is necessary and should be given whenever uncharged target offenses form a part of the

prosecution's theory of criminal liability and substantial evidence supports the theory. When these conditions are satisfied, an instruction identifying and describing potential target offenses is necessary to minimize the risk that the jury, generally unversed in the intricacies of criminal law, will "indulge in unguided speculation" (*People* v. *Failla, supra,* at p. 564) when it applies the law to the evidence adduced at trial.

In an aiding and abetting case involving application of the "natural and probable consequences" doctrine, identification of the target crime will facilitate the jury's task of determining whether the charged crime allegedly committed by the aider and abettor's confederate was indeed a natural and probable consequence of any uncharged target crime that, the prosecution contends, the defendant knowingly and intentionally aided and abetted. The facts of this case illustrate this point. If, for example, the jury had concluded that defendant Bray had encouraged codefendant Prettyman to commit an assault on Van Camp but that Bray had no reason to believe that Prettyman would use a deadly weapon such as a steel pipe to commit the assault, then the jury could not properly find that the murder of Van Camp was a natural and probable consequence of the assault encouraged by Bray. (*People* v. *Butts, supra,* 236 Cal.App.2d at p. 836.) If, on the other hand, the jury had concluded that Bray encouraged Prettyman to assault Van Camp with the steel pipe, or by means of force likely to produce great bodily injury, then it could appropriately find that Prettyman's murder of Van Camp was a natural and probable consequence of that assault. Therefore, instructions identifying and describing the crime of assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245) as the appropriate target crime would have assisted the jury in determining whether Bray was guilty of Van Camp's murder under the "natural and probable consequences" doctrine.

To apply the "natural and probable consequences" doctrine to aiders and abettors is not an easy task. The jury must decide whether the defendant (1) with knowledge of the confederate's unlawful purpose, and (2) with the intent of committing, encouraging, or facilitating the commission of any target crime(s), (3) aided, promoted, encouraged, or instigated the commission of the target crime(s); whether (4) the defendant's confederate committed an offense *other than* the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated. Instructions describing each step in this process ensure proper application by the jury of the "natural and probable consequences" doctrine.

As pointed out by the court in *People* v. *Solis, supra,* 20 Cal.App.4th 264, to convict a defendant of a crime under this doctrine, the jury need not

unanimously agree on the particular target crime the defendant aided and abetted. (See *People* v. *Santamaria* (1994) 8 Cal.4th 903, 918 [35 Cal.Rptr.2d 624, 884 P.2d 81] ["It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty."]; see also *People* v. *Pride* (1992) 3 Cal.4th 195, 249-250 [10 Cal.Rptr.2d 636, 833 P.2d 643] [jury may convict defendant of first degree murder despite lack of unanimity as to whether killing was premeditated murder or felony murder]; *People* v. *Failla, supra,* 64 Cal.2d at p. 569 [in burglary prosecution, jury need not agree on which felony defendant intended to commit upon entering building].) In many cases in which the doctrine is applicable, the defendant is not charged with the target crime, but with another crime that was allegedly committed by the defendant's confederate.[6] Nevertheless, at trial each juror must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a *criminal act*, and that the offense actually committed was a natural and probable consequence of that act. Contrary to *Solis*, a conviction may not be based on the jury's generalized belief that the defendant intended to assist and/or encourage unspecified "nefarious" conduct.[7] To ensure that the jury will not rely on such generalized beliefs as a basis for conviction, the trial court should identify and describe the target or predicate crime that the defendant may have aided and abetted.[8]

In *Failla*, which we discussed earlier, we held that when a defendant is charged with burglary, the trial court, *on its own initiative*, must give instructions to the jury identifying and defining the target offense(s) that the defendant allegedly intended to commit upon entry into the building. (*People* v. *Failla, supra,* 64 Cal.2d at pp. 564-565.) Similarly, when the prosecution relies on the "natural and probable consequences" doctrine to hold a defendant liable as an aider and abettor, the trial court must, *on its own initiative*, identify and describe for the jury any target offense allegedly aided and abetted by the defendant. As we explained in *Failla*, such instructions are

---

[6]Of course, in some cases the defendant will be charged with the target crime in addition to the offense that is a natural and probable consequence thereof. (See, e.g., *People* v. *Nguyen* (1988) 204 Cal.App.3d 181 [251 Cal.Rptr. 40] [defendant charged and convicted as an aider and abettor both of the target crime of robbery and of attempted murder as a natural and probable consequence of the robbery.].)

[7]We disapprove *People* v. *Solis, supra,* 20 Cal.App.4th 264, to the extent that it is inconsistent with the views expressed herein.

[8]Justice Brown's concurrence and dissent asserts that our "new instructional requirements" will "vex trial judges and perplex juries." (Conc. and dis. opn. of Brown, J., *post,* at p. 292.) But jury instructions on target crimes under the "natural and probable consequences" doctrine are hardly "new." For more than four years the pattern CALJIC instructions on the doctrine have included target crimes (see CALJIC No. 3.02 (1992 rev.)), and we have seen no evidence of vexation or perplexity.

"necessary to the jury's understanding of the charge and [are] 'closely and openly connected with the facts of the case before the court.'" (*People* v. *Failla, supra*, 64 Cal.2d at p. 565.)

We recognize that the workload of our already heavily burdened trial courts is increased whenever we impose on trial judges an obligation to provide a particular jury instruction sua sponte. We also recognize that "the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly." (*People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].) ▮ But the sua sponte duty to instruct that is imposed here is quite limited. It arises only when the prosecution has elected to *rely* on the "natural and probable consequences" theory of accomplice liability and the trial court has determined that the evidence will support instructions on that theory. The trial court, moreover, need not identify *all* potential target offenses supported by the evidence, but only those that the prosecution wishes the jury to consider.[9]

The trial court should grant a prosecutor's request that the jury be instructed on the "natural and probable consequences" rule only when (1) the record contains substantial evidence that the defendant intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant's confederate was a "natural and probable consequence" of the specifically contemplated target offense. If this test is not satisfied, the instruction should not be given, even if specifically requested.

In *People* v. *Solis, supra*, 20 Cal.App.4th at page 272, the court stated that an aider and abettor can "become liable for the commission of a very serious crime" committed by the aider and abettor's confederate even though "the target offense contemplated by his aiding and abetting may have been trivial." Rarely, if ever, is that true. Murder, for instance, is *not* the "natural and probable consequence" of "trivial" activities. To trigger application of the "natural and probable consequences" doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed.

▮ In this case, the record does not show that the prosecutor sought to have the jury instructed on the "natural and probable consequences" doctrine as a basis for convicting defendant Bray of the murder of Van Camp

---

[9]If the the prosecutor requests that the jury be instructed on the "natural and probable consequences" doctrine, but fails to identify potential target crimes, the trial court should inquire about the particular target offenses on which instruction is desired.

committed by codefendant Prettyman, and the prosecutor made no mention of the doctrine in his closing argument to the jury. Because the prosecutor did not rely on this doctrine, the trial court was under no duty to instruct the jury on it, for it was not one of the "general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People* v. *Montoya*, *supra*, 7 Cal.4th at p. 1047.) Alternatively, the court could have asked the prosecutor if he wanted the jury instructed on the rule, and, if so, what target crime(s) the prosecutor believed to be appropriate.[10] But once the trial court, without a request therefor, chose to instruct the jury on the "natural and probable consequences" rule, it had a duty to issue instructions identifying and describing each potential target offense supported by the evidence. By failing to do so, the trial court erred. Was the error prejudicial? That is the question we turn to in the section that follows.

### VI. *Prejudicial Effect of Trial Court's Inadequate Instructions on the "Natural and Probable Consequences" Doctrine*

 Defendant Bray contends that the trial court's instructional error denied her due process of law under the Fourteenth Amendment to the United States Constitution. Because the error violated a federal constitutional right, she contends, the error was either "reversible per se" (*People* v. *Cummings* (1993) 4 Cal.4th 1233, 1314-1315 [18 Cal.Rptr.2d 796, 850 P.2d 1] [failure to instruct on four of the five elements of robbery reversible per se]), or was prejudicial under the "harmless-beyond-a-reasonable-doubt" test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. We disagree. As we shall explain, the trial court's failure to identify and describe target crimes when instructing on the "natural and probable consequences" rule did not violate defendant's federal due process rights.

Bray likens the instructional error here to a failure to instruct the jury on certain elements of the crime charged. (See *United States* v. *Gaudin* (1995) 515 U.S. 506, __ [132 L.Ed.2d 444, 449, 115 S.Ct. 2310, 2313] [federal Constitution requires "criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime . . . charged . . . ."].) Bray contends that under the "natural and probable consequences" doctrine, the elements of target offenses aided and abetted are "functionally"

---

[10]Had the prosecutor so elected, for example, the evidence in this case would have supported an instruction on the "natural and probable consequences" rule that identified assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245) as a target crime.

elements of the crime actually charged. Thus, she reasons, by instructing the jury on the "natural and probable consequences" doctrine as to the charge of murder, without also instructing on the elements of any target crime originally contemplated, the trial court in effect failed to instruct the jury on all of the elements of the murder she was charged with aiding and abetting.

We do not agree with Bray that because the trial court instructed the jury on the "natural and probable consequences" doctrine, the elements of any target crime Bray might have intentionally encouraged or assisted codefendant Prettyman in committing thereby became elements of the crime with which Bray was charged, namely, murder, the crime actually perpetrated by Prettyman. The elements of murder are set forth in the statutes defining first and second degree murder. (§§ 187, 189.) Not included in those elements are general rules of accomplice liability, such as the identification and description of target offenses under the "natural and probable consequences" doctrine.

True, this court has held that "*Beeman* error"—a trial court's failure to instruct the jury that an aider and abettor must have the specific intent to aid the principal's crime, as required by *People* v. *Beeman, supra,* 35 Cal.3d at pages 550-551—is federal constitutional error. (*People* v. *Croy, supra,* 41 Cal.3d at pp. 12-16.) Federal courts reviewing claims of *Beeman* error by prisoners convicted in California state courts and seeking federal habeas corpus relief have reached the same conclusion. (*Roy* v. *Gomez* (9th Cir. 1996) 81 F.3d 863, 866, revd. on other grounds *sub nom. California* v. *Roy* (1996) __ U.S. __ [136 L.Ed.2d 266, 117 S.Ct. 337]; *Martinez* v. *Borg* (9th Cir. 1990) 937 F.2d 422, 423.) *Beeman* error, however, "consists of failing to instruct the jury that it must find a particular intent in order to find guilt . . . ." (*People* v. *Croy, supra,* 41 Cal.3d at p. 13.) Here, by contrast, no such error occurred in the trial court's instructions on the "natural and probable consequences" doctrine.

Under the "natural and probable consequences" doctrine, as we have previously explained, the jury must decide: whether the defendant (1) with knowledge of the confederate's unlawful purpose; and (2) with the intent of committing, encouraging, or facilitating the commission of any target crime(s); (3) aided, promoted, encouraged, or instigated the commission of the target crime(s). The jury must also determine whether (4) the defendant's confederate committed an offense *other than* the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated. The trial court's instructions in this case encompassed each of these aspects of the "natural and probable consequence" rule. Therefore, "as

worded, the instruction[s] [do] not withdraw an element from the jury's determination or otherwise interject an impermissible presumption into the deliberative process" (*People* v. *Cox* (1991) 53 Cal.3d 618, 669 [280 Cal.Rptr. 692, 809 P.2d 351]), nor do they "fail[] to instruct the jury that it must find a particular intent in order to find guilt . . . ." (*People* v. *Croy*, *supra*, 41 Cal.3d at p. 13.)

As we pointed out earlier, however, when a trial court instructs the jury on the "natural and probable consequences" doctrine, but fails to identify and describe the target crime(s) allegedly contemplated by the defendant, there is a risk that the jury will "indulge in unguided speculation" (*People* v. *Failla*, *supra*, 64 Cal.2d at p. 564) in making the requisite factual findings. Thus, the trial court's instructions in this case, which did not identify or describe any target offenses, were somewhat ambiguous, because they left open the possibility that the jury might engage in unguided speculation.

The United States Supreme Court has held that "in reviewing an ambiguous instruction . . . , we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (*Estelle* v. *McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 399, 112 S.Ct. 475], quoting *Boyde* v. *California* (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316, 328-329, 110 S.Ct. 1190]; see also *People* v. *Avena* (1996) 13 Cal.4th 394, 417 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) As we shall explain, here there is no "reasonable likelihood" that the jury misapplied the trial court's instructions on the "natural and probable consequences" doctrine, and thus no federal constitutional error occurred.

The trial court instructed the jury in these words: "One who aids and abets is not only guilty of the particular crime aided and abetted, but is also liable for the natural and probable consequences of the crimes they abet. You must determine whether the defendant is guilty of the crime originally contemplated, and, if so, whether any other crime charged was a natural and probable consequence of such originally contemplated crime." None of the parties, however, mentioned this instruction in their closing arguments to the jury.

The prosecutor's theory at trial was that defendant Bray was guilty as an aider and abettor to the murder of Van Camp committed by codefendant Prettyman because Bray intentionally assisted the commission of the murder itself, not because she facilitated or assisted some predicate or target offense of which murder was the natural and probable consequence. As the prosecutor argued to the jury: "Miss Bray is also guilty. She did not swing the pipe. She did not do the act which caused the death, because the death was

caused by Mr. Prettyman. But she aided and abetted and assisted and conspired with Mr. Prettyman in the killing. . . . She encouraged, she facilitated and she intended to have . . . Mr. Prettyman do the killing, and he did. And under the law, she is just as guilty of murder, and that's first degree murder."

The defense, in closing argument, attacked the credibility of prosecution witnesses Edward Eash (who testified he heard Bray threaten to "get" victim Van Camp) and Dennis Charette (who testified that Bray approached him immediately after the killing and told him to leave and not to tell anyone about the matter). According to the defense, the prosecution had not shown beyond a reasonable doubt that Bray had intended to bring about the death of Van Camp. Like the prosecution, the defense did not mention the "natural and probable consequences" rule in its argument to the jury.

Because the parties made no reference to the "natural and probable consequences" doctrine in their arguments to the jury, it is highly unlikely that the jury relied on that rule when it convicted defendant Bray. Rather, it appears that the jury was persuaded by the prosecutor's argument that Bray encouraged or assisted codefendant Prettyman to murder Van Camp, and thus was guilty of murder as an accomplice to that crime, not as an accomplice to some other unlawful act of which the murder was a natural and probable consequence.

Even if the jury relied on the "natural and probable consequences" doctrine in convicting Bray, there is little likelihood in this case that the trial court's failure to identify and describe potential target crimes caused the jury to *misapply* the doctrine. Prettyman bludgeoned Van Camp to death shortly after Bray was heard exhorting Prettyman to "get" Van Camp. There was no evidence of any other possible "target" apart from Prettyman's assault on Van Camp, an act that was indisputably criminal. There was no evidence that Bray aided and abetted any noncriminal behavior which led, as a "natural and probable consequence," to Prettyman's murder of Van Camp, and neither the prosecution nor the defense mentioned any such behavior in their closing arguments to the jury. Under these circumstances, it is unlikely that the trial court's failure to specify assault with a deadly weapon as a target crime led the jury to misapply the "natural and probable conse- quences" doctrine by convicting Bray of murder on the theory that she assisted or encouraged some noncriminal target act.

Thus, there is not " 'a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution" (*Estelle* v. *McGuire, supra*, 502 U.S. at p. 72 [116 L.Ed.2d at p. 399]). Accordingly, the

trial court's failure to issue instructions to the jury identifying or describing any target offense(s) that Bray might have encouraged or assisted codefendant Prettyman to commit in this case did not violate defendant's federal constitutional right to due process of law.

 Although this omission by the trial court did not violate the federal Constitution, it was nonetheless improper under state law. As previously explained, the trial court should either have made no mention of the "natural and probable consequences" doctrine, or if it chose to instruct the jury on the doctrine, it should have done so in a more complete fashion by instructing on potential target crimes. The error, however, was harmless. As explained above, the prosecution proceeded on the theory that Bray encouraged or assisted codefendant Prettyman to murder Van Camp and was guilty of murder as an accomplice to that crime. This theory was amply supported by the evidence, and it is not reasonably probable that the trial's outcome would have been different in the absence of the trial court's instructional error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### VII. *Failure to Instruct on Involuntary Manslaughter*

 Bray contends the trial court should have instructed the jury on the crime of involuntary manslaughter, a lesser offense necessarily included in the charged crime of murder. Bray did not request such an instruction. She asserts, however, that the court should have given the instruction on its own initiative.

The rules governing instruction on lesser included offenses are well established. As we reiterated recently, a trial court must, sua sponte, instruct the jury on lesser included offenses " 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People* v. *Barton* (1995) 12 Cal.4th 186, 194-195 [47 Cal.Rptr.2d 569, 906 P.2d 531], quoting *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], brackets in original.)

Manslaughter is "the unlawful killing of a human being without malice." (§ 192.) Involuntary manslaughter is a killing committed "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Generally, involuntary manslaughter is a lesser offense included within the crime of murder. (*People* v. *Edwards* (1985) 39 Cal.3d 107, 116, fn. 10 [216 Cal.Rptr. 397, 702 P.2d 555]; *In re McCartney* (1966) 64 Cal.2d 830, 831 [51 Cal.Rptr. 894, 415 P.2d 782].)

In this case, there was no evidence that *as to codefendant Prettyman*, the offense was less than the charged crime of murder; as to *Prettyman*,

therefore, the trial court had no duty to instruct the jury, sua sponte, on involuntary manslaughter. Defendant Bray does not contend otherwise. She argues, however, that as to *her* the evidence supported an instruction on involuntary manslaughter. She reasons: "When a defendant perpetrates an assault that results in an unintended death, and the defendant lacks malice, the defendant is guilty of involuntary manslaughter. Similarly, the liability of a defendant who *aids and abets* a fatal assault should be limited to involuntary manslaughter if she did not intend the victim be killed and the killing was not a natural and probable consequence of the assault she intentionally aided." Therefore, Bray asserts, in her case the evidence would have supported a jury determination that she was guilty only of involuntary manslaughter, and the trial court should, on its own initiative, have instructed the jury on this lesser offense.

Inherent in Bray's contention are the propositions that an accomplice to a criminal offense may in some circumstances be guilty of a crime less serious than that committed by the principal, and that the trial court must, even in the absence of a request by the defense, instruct the jury on a lesser included offense arguably committed by the aider and abettor, even if the evidence would not support a jury finding that the actual perpetrator was guilty only of that offense. In support, Bray cites a Court of Appeal decision, *People* v. *Woods* (1992) 8 Cal.App.4th 1570 [11 Cal.Rptr.2d 231].

In *Woods,* the defendant and a companion went in search of a rival gang member. They entered the apartment of two acquaintances of the member of the rival gang, and assaulted the occupants. As they were leaving, they saw two people getting into a car. The defendant's companion fired into the car, killing one occupant and injuring the other. At trial, the prosecution's theory was that the defendant was criminally responsible for the shootings committed by his companion, contending that the shootings were a natural and probable consequence of the crimes committed in the apartment that the defendant had aided and abetted. During deliberations, the jury asked, "Can a defendant be found guilty of aiding and abetting a murder in the second degree if the actual perpetrator of the same murder is determined to be guilty of murder in the first degree?" The trial court answered, "No." The Court of Appeal held that this answer was prejudicial error. (*People* v. *Woods, supra,* 8 Cal.App.4th at pp. 1579-1590.)

The *Woods* court reasoned that when the prosecution contends that the defendant is guilty as an accomplice under the "natural and probable consequences" doctrine, the defendant "does not stand in the same position as the perpetrator"; hence, "the aider and abettor and the perpetrator may have differing degrees of guilt based on the same conduct depending on which of the perpetrator's criminal acts were reasonably foreseeable under the

circumstances and which were not." (*People* v. *Woods, supra,* 8 Cal.App.4th at pp. 1586-1587, italics omitted.)

*Woods* also addressed the question whether the trial court should have instructed the jury on the lesser included offenses of voluntary and involuntary manslaughter. Although the court concluded that under the facts of that case such instructions were unnecessary, it held that in some cases such instructions would be necessary at the trial of an aider and abettor even if the evidence did not show that the *actual perpetrator* was guilty only of the lesser included offense. As the court explained: "If the evidence raises a question whether the offense charged against the aider and abettor is a reasonably foreseeable consequence of the criminal act originally aided and abetted but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence, the trial court has a duty to instruct sua sponte on the necessarily included offense as part of the jury instructions on aider and abettor liability." (*People* v. *Woods, supra,* 8 Cal.App.4th at p. 1593.)[11]

■ In this case, even if one were to assume that the trial court erred in failing to instruct the jury on involuntary manslaughter as a lesser offense necessarily included in the crime of murder, the error was harmless. The trial court instructed the jury on the crime of second degree murder, a lesser offense included within the crime of first degree murder. The jury, by convicting Bray of first degree murder rather than second degree murder, necessarily rejected the possibility that the only natural and probable consequence of the crime she aided and abetted was involuntary manslaughter, a less serious crime. Because "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions" (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 721), Bray suffered no prejudice from any possible error in failing to instruct on involuntary manslaughter.

## CONCLUSION

The judgment of the Court of Appeal is affirmed.

George, C. J., Werdegar, J., and Chin, J., concurred.

---

[11]Bray's argument appears to be based on reasoning similar to, but slightly different from, the analysis of the Court of Appeal in *People* v. *Woods, supra,* 8 Cal.App.4th 1570. She does not argue that the jury could have convicted her of involuntary manslaughter because that crime was a natural and probable consequence of a crime she encouraged or assisted; rather, she contends that she could have been found guilty of that offense under the general rules of liability for aiders and abettors described in *People* v. *Beeman, supra,* 35 Cal.3d 547. She reasons that the jury could have convicted her of involuntary manslaughter if it concluded that she aided and abetted an assault on victim Van Camp which resulted in his death, but that the death was not a natural and probable consequence of the assault.

**MOSK, J.**—I concur in the result.

The majority are right in their affirmance of the judgment of the Court of Appeal: The underlying judgment of the superior court against defendant Debra Jane Bray, which is predicated on her criminal liability for the first degree murder of Gaylord Van Camp as an aider and abettor of her codefendant Richard D. Prettyman, must itself be affirmed because there was no reversible error in the instructions on that issue or otherwise.

Other than in the result, however, I do not concur.

The majority are wrong in their discussion of a trial court's duty to instruct on the criminal liability of the aider and abettor, both generally and in this case itself.

I

We granted review in this cause to resolve a conflict between *People* v. *Mouton* (1993) 15 Cal.App.4th 1313 [19 Cal.Rptr.2d 423] (hereafter sometimes *Mouton*), decided by Division Three of the First Appellate District of the Court of Appeal, and *People* v. *Solis* (1993) 20 Cal.App.4th 264 [25 Cal.Rptr.2d 184] (hereafter sometimes *Solis*), decided by Division One of the Fourth Appellate District of the Court of Appeal.

Under California law, the criminal liability of an aider and abettor is derivative of that of the actual perpetrator. The aider and abettor may be found guilty of the crime committed by the actual perpetrator that he in fact aids and abets—the "target" crime. But, under the natural-and-probable-consequence rule, the aider and abettor may also be found guilty of any other crime committed by the actual perpetrator—an "ultimate" crime—if any such "ultimate" crime is a natural and probable consequence of the "target" crime.

The *Mouton* court held that, even without a request, a trial court must instruct on any uncharged target crime and its elements—to quote, it must "specify" and "define" any such offense—whenever the prosecution seeks to prove an aider and abettor's guilt of a charged ultimate crime under the natural-and-probable-consequence rule. (*People* v. *Mouton, supra,* 15 Cal.App.4th at pp. 1318-1319.) It stated that, "[i]n a criminal case, even absent a request, the trial court has the obligation to instruct the jury on all general legal principles raised by the evidence and necessary for the jury's understanding of the case." (*Ibid.*) It implied that such "general legal principles" include the law relating to any target crime and its elements. (*Id.* at pp. 1318-1321.)

Declining to follow *Mouton,* the *Solis* court held that a trial court generally need not instruct on any uncharged target crime and its elements when the prosecution seeks to prove an aider and abettor's guilt of a charged ultimate crime under the natural-and-probable-consequence rule. (*People* v. *Solis, supra,* 20 Cal.App.4th at pp. 274-275.) It expressed the view that to instruct on a target crime and its elements might burden the jury: It might make even more difficult its already "difficult task of comprehending that the" aider and abettor "may be found guilty of a crime he did not personally commit." (*Id.* at p. 275.) It also expressed the view that to instruct on a target crime and its elements would not benefit the jury: Far from being included among the "general legal principles raised by the evidence and necessary for the jury's understanding of the case" (*People* v. *Mouton, supra,* 15 Cal.App.4th at p. 1319), the law relating to the target crime and its elements is "irrelevant to the determination of whether the ultimate crime was a natural and probable consequence . . . . Whether there is a nexus of foreseeability between" the target crime and the ultimate crime "depends not on crime definitions but on the specific *facts* of each offense." (*People* v. *Solis, supra,* 20 Cal.App.4th at pp. 273-274, italics in original.)

Whether we should in fact have granted review in this cause to resolve the conflict between *Mouton* and *Solis* is open to question. That is because the issue whether the trial court, even without a request, must instruct on any uncharged target crime and its elements whenever the prosecution seeks to prove an aider and abettor's guilt of a charged ultimate crime under the natural-and-probable-consequence rule simply does not present itself here. The record on appeal is clear on its face: The prosecution did *not* seek so to prove Bray's guilt as an aider and abettor. To be sure, the superior court did indeed instruct on the natural-and-probable-consequence rule. But, from all that appears, it did so *ex mero motu* and solely by inadvertence, without support in the facts and without need under the law.

Be that as it may, having granted review, we must at least resolve the conflict correctly. That means that we must follow *Solis* and reject *Mouton*— with the result that a trial court generally need not instruct on an uncharged target crime and its elements when the prosecution seeks to prove an aider and abettor's guilt of a charged ultimate crime under the natural-and-probable-consequence rule. My reasons are as follows.

At the very outset, we should avoid loading yet another sua sponte instructional duty on trial courts, which are already laden down under similar obligations (*People* v. *Ibarra* (1982) 134 Cal.App.3d 413, 422-423, fn. 5 [184 Cal.Rptr. 639]; *People* v. *Myers* (1981) 125 Cal.App.3d 735, 744 [178 Cal.Rptr. 259], disapproved on another point, *People* v. *Wolcott* (1983) 34 Cal.3d 92, 101 [192 Cal.Rptr. 748, 665 P.2d 520]).

Moreover, as *Solis* recognizes and *Mouton* ignores, to instruct on an uncharged target crime and its elements might burden the jury: It would make a difficult task more difficult still.

In addition, as *Solis* also recognizes and *Mouton* also ignores, to instruct on an uncharged target crime and its elements would not benefit the jury: it would rather misdirect its focus away from relevant facts toward inapplicable law. The teaching of decisions such as *People* v. *Durham* (1969) 70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198] and *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392] cannot be denied: The determination whether an ultimate crime is a natural and reasonable consequence of a target crime is not the resolution of a pure question of law that depends on a comparison of the offenses and their individual requirements in the abstract. It is rather the resolution of a pure question of fact that turns on an assessment of the circumstances surrounding the commission of the crimes in the concrete.[1]

Lastly, to instruct on an uncharged target crime and its elements might threaten the fairness of the proceedings or the reliability of the outcome, to the detriment of the aider and abettor himself. In *People* v. *Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423], we concluded that, at the penalty phase of a capital trial, the court generally need not instruct on a crime and its elements under the aggravating factor for other criminal activity involving force or violence. (*Id.* at p. 73, fn. 25 (plur. opn. by Reynoso, J.).) We reasoned that "a defendant for tactical considerations may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of . . . other crimes, perhaps because he fears that such instructions could result in the jury placing undue significance on such other crimes rather than on the central question of whether he should live or die." (*Ibid.*) *Mutatis mutandis*, that reasoning applies here. An aider and abettor might not desire instructions on uncharged target crimes and their elements, because he might be afraid that they might lead the jury to overemphasize the target crimes and to scant the ultimate crime—including the crucial issue of his guilt or innocence.

---

[1]See, e.g., *People* v. *Nguyen* (1993) 21 Cal.App.4th 518, 531 [26 Cal.Rptr.2d 323] ("The determination whether [an ultimate crime] was a natural and probable consequence of [a target crime] . . . requires application of an objective rather than subjective test. [Citations.] This does not mean that the issue is to be considered in the abstract as a question of law. [Citation.] Rather, the issue is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident. (*People* v. *Croy* [(1985)] 41 Cal.3d [1,] 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Durham* [(1969)] 70 Cal.2d [171,] 181 [74 Cal.Rptr. 262, 449 P.2d 198].) Consequently, the issue . . . depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the [ultimate crime] was a reasonably foreseeable consequence of the" target crime.).

Although a trial court generally need not instruct on an uncharged target crime and its elements when the prosecution seeks to prove an aider and abettor's guilt of a charged ultimate crime under the natural-and-probable-consequence rule, it must indeed do so in a single situation. That is when there is evidence capable of raising a reasonable doubt whether the conduct underlying the target crime is in fact sufficient therefor. For, if it is not adequate, the aider and abettor cannot be found guilty of the ultimate crime under the natural-and-probable-consequence rule. By definition, the ultimate crime must be the natural and probable consequence of a target *crime*.

When we turn to the case at bar, we are compelled to conclude that the superior court did not err by failing to instruct on any uncharged target crime or its elements. As stated, the prosecution simply did not seek to prove Bray's guilt of any charged ultimate crime as an aider and abettor under the natural-and-probable-consequence rule.

In one respect, however, the superior court did indeed err. It instructed on the natural-and-probable-consequence rule itself. In so doing, it instructed "abstractly"—that is, in correct legal terms but without factual applicability (*People* v. *Rowland* (1992) 4 Cal.4th 238, 282 [14 Cal.Rptr.2d 377, 841 P.2d 897]). It should not have done so. (See *ibid.*)

The superior court's error in giving an "abstract" instruction on the natural-and-probable-consequence rule violated California law, but did not implicate the United States Constitution. (See *People* v. *Rowland, supra,* 4 Cal.4th at p. 282 & fn. 21 at pp. 282-283.) In most cases an error of this sort is harmless. (*Id.* at p. 282.) So was it here. The instruction on the rule must have been understood, and dismissed, by the jury as mere surplusage. (See *ibid.*) It cannot be held to have resulted in a "miscarriage of justice." (Cal. Const., art. VI, § 13.) It was too insignificant to have affected the outcome within a "reasonable probabilit[y]," as required by *People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].

## II

In resolving the conflict between *Mouton* and *Solis*, the majority do so incorrectly. That is to say, they choose to follow the former and reject the latter—with the result that, even without a request, a trial court must instruct on any uncharged target crime and its elements—in their somewhat ambiguous words, it must "identify" and "describe" any such offense (see, e.g.,

maj. opn., *ante*, at p. 254)[2]—whenever the prosecution seeks to prove an aider and abettor's guilt of a charged ultimate crime under the natural-and-probable-consequence rule.

To the extent that the majority rely on reason, they are not persuasive. Let us consider each of their points in turn.

First, the majority assert that an instruction on any uncharged target crime and its elements will make it easier for the jury to determine whether the charged ultimate crime was a natural and probable consequence. But, as stated, such a determination is not the resolution of a pure question of law that depends on a comparison of the offenses and their individual requirements in the abstract. It is rather the resolution of a pure question of fact that turns on an assessment of the circumstances surrounding the commission of the crimes in the concrete.[3]

Second, the majority assert that an instruction on any uncharged target crime and its elements will make it harder for the jury to speculate as to what conduct is in fact sufficient therefor. But, in the general case, the likelihood of such speculation is itself purely conjectural. So long as it is properly instructed on the natural-and-probable-consequence rule, the jury will direct its labors to the facts, and will not be tempted to muse about the law.

To the extent that the majority rely on authority, they are even less persuasive. After close consideration, their invocation of *People* v. *Failla* (1966) 64 Cal.2d 560 [51 Cal.Rptr. 103, 414 P.2d 39] (hereafter sometimes *Failla*), proves to help them not at all.

Failla was charged with five counts of burglary, which arose out of the breaking and entry into the apartments of five different women at night. At

---

[2]As noted, the *Mouton* court used the more precise words "specify" and "define." (*People* v. *Mouton, supra,* 15 Cal.App.4th at p. 1318.)

[3]An example that the majority present to prove their point does the opposite. "If," they say, "the jury had concluded that . . . Bray had encouraged . . . Prettyman to commit an assault on Van Camp but that Bray had no reason to believe that Prettyman would use a deadly weapon such as a steel pipe to commit the assault, then the jury could not properly find that the murder of Van Camp was a natural and probable consequence of the assault encouraged by Bray. [Citation.] If, on the other hand, the jury had concluded that Bray encouraged Prettyman to assault Van Camp with the steel pipe, or by means of force likely to produce great bodily injury, then it could appropriately find that Prettyman's murder of Van Camp was a natural and probable consequence of that assault. Therefore, instructions identifying and describing the crime of assault with a deadly weapon or by means of force likely to produce great bodily injury [citation] as the appropriate target crime would have assisted the jury in determining whether Bray was guilty of Van Camp's murder under the 'natural and probable consequences' doctrine." (Maj. opn., *ante,* at p. 267.) Not so. The *law,* as to either simple or aggravated assault, is of little importance. What matters, as the majority themselves imply, are the *facts*—including what, if anything, Bray actually "had . . . reason to believe" and what, if anything, she actually "encouraged."

trial, "the evidence showed [he] entered each apartment, awoke the victim, and threatened her into silence. On Count I there was evidence tending to show that [he] intended to commit an act of oral copulation . . . ; but when the victim resisted and told him she was menstruating, [he] masturbated and left. On Count II [he] told the victim he wanted to show her his penis; he did so, and announced his intention to masturbate. . . . On Count III [he] told the victim, 'I want you to play with me'; he took her hand and forced her to masturbate him, then left. On Count IV [he] told the victim he did not want to have intercourse with her but just wanted to kiss her; he put his hand on her private parts, and left when she began screaming. On Count V [he] appeared on the victim's windowsill clad only in underwear, and said, 'I want you'; she screamed and he left." (*People* v. *Failla, supra,* 64 Cal.2d at p. 563.) The court instructed the jury that "one who enters an apartment with intent to commit theft 'or any felony' is guilty of burglary," and that "a necessary element of burglary is a specific intent to commit theft 'or any felony.' " (*Id.* at pp. 563-564.) The jury found Failla guilty of each of the five burglaries charged. The court rendered judgment accordingly.

Having granted a hearing, we held: "The court committed . . . error in failing to give a[n] . . . instruction on its own motion defining 'felony' and advising the jury which acts [Failla], upon entry, may have intended to commit would amount to felonies. . . . [W]here the evidence permits an inference that the defendant at the time of entry intended to commit one or more felonies and also an inference that his intent was merely to commit one or more misdemeanors or acts not punishable as crimes, the court must define 'felony' and must instruct the jury which acts, among those which the jury could infer the defendant intended to commit, amount to felonies. . . . [¶] . . . [O]n each burglary count the jury was required to find [Failla's] intent upon entry circumstantially from his conduct and statements after entry. But on the evidence presented such conduct and statements remained ambiguous: they were subject to an inference not only that [he] intended to commit one or more felonies (e.g., oral copulation . . .), but also intended to commit one or more misdemeanors (e.g., indecent exposure or battery) or acts which are not crimes (e.g., masturbation)." (*People* v. *Failla, supra,* 64 Cal.2d at pp. 564-565.)

The majority claim that *Failla* holds that, even without a request, a trial court must instruct on any predicate felony and its elements whenever the prosecution seeks to prove a burglar's guilt.

*Failla* does no such thing.

As its very words establish, *Failla* holds only that, even without a request, a trial court must instruct on any predicate felony and its elements when the

prosecution seeks to prove a burglar's guilt *in a situation in which there is evidence capable of raising a reasonable doubt whether the conduct underlying the predicate felony is in fact sufficient therefor.*

Hence, *Failla* does not support the majority's conclusion that, even without a request, a trial court must instruct on any uncharged target crime and its elements whenever the prosecution seeks to prove an aider and abettor's guilt of a charged ultimate crime under the natural-and-probable-consequence rule. It is rather altogether consistent with my position that a trial court generally need not instruct on an uncharged target crime and its elements when the prosecution seeks to prove an aider and abettor's guilt of a charged ultimate crime under the natural-and-probable-consequence rule, *except in a situation in which there is evidence capable of raising a reasonable doubt whether the conduct underlying the target crime is in fact sufficient therefor.*

Next, in turning their attention to what transpired in the superior court below, the majority do little better. Only brief comment is called for.

The majority conclude that the superior court erred, under California law and not the United States Constitution, but do so rather curiously. They reason that, once it undertook to instruct on the natural-and-probable-consequence rule, *in spite of the fact that the rule was inapplicable*, it was then bound to instruct on any uncharged target crime and its elements, *even though such an instruction would have been required only if the rule had in fact been applicable.* Their only support is ipse dixit. It is not enough.

## III

Because the judgment of the Court of Appeal is sound, I join the majority in affirmance. But, for the reasons stated above, I join them no further.

BAXTER, J.—I concur. The majority correctly affirm the judgment of the Court of Appeal. Defendant Debra Jane Bray's conviction of the first degree murder of Gaylord Van Camp was predicated on her criminal liability as an aider and abettor of her codefendant, Richard D. Prettyman. She became a principal in the crime thereby, the record evidence is sufficient to support the jury's verdict finding her guilty of first degree murder, and there was no reversible error in the instructions given on which that verdict was based.

I disagree, however, with the rationale by which the majority find harmless the trial court's giving of an instruction on the "natural and probable consequences" doctrine on its own motion. I agree with the views of Justice

Mosk on the point—in so instructing the jury the trial court plainly erred, but the nature of the error is *not* that the instruction given set forth the "natural and probable consequences" doctrine in legally incorrect terms for the jury. Rather, the instruction was simply surplusage, unrequested by the People, and without any direct factual applicability to the People's case-in-chief. (*People* v. *Rowland* (1992) 4 Cal.4th 238, 282, & fn. 21 at pp. 282-283 [14 Cal.Rptr.2d 377, 841 P.2d 897].) As such, although to so instruct the jury was error, it did not implicate Bray's rights under the United States Constitution, nor can it be said to have resulted in a "miscarriage of justice" within the meaning of the California Constitution. (Cal. Const., art. VI, § 13.) I would therefore simply find that it is not reasonably probable a result more favorable to the defendant would have been reached had the trial court refrained from giving the superfluous instruction. (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].)

It should be understood that the majority's holding today only obligates a trial court to instruct on the "natural and probable consequences" doctrine where the prosecution expressly advises the court that it is relying upon that theory of liability, and that the trial court need only further "describe" the target offense or offenses for the jury where the prosecutor then *identifies* for the court those target offenses upon which it is relying.[1] This does not, to my mind, set forth a classic "sua sponte" duty to instruct on the part of the trial court. Indeed, where it becomes apparent that a trial court has erroneously or mistakenly instructed on the "natural and probable consequences" doctrine on its own motion, in contravention of the People's theory of its case-in-chief, either the People or the defendant might be expected to, and should be permitted to object to any *further* instructions on the doctrine, and indeed, request that the jury be admonished to disregard the erroneous instruction.

**BROWN, J.,** Concurring and Dissenting.—I concur solely in the judgment affirming the decision of the Court of Appeal; otherwise, I respectfully dissent.

The broad and amorphous rule formulated by the majority finds no support in either the general principles governing a trial court's obligation to instruct sua sponte or the analytical underpinnings of the natural and probable consequences theory of aiding and abetting liability. Moreover, the rule is likely to confuse jurors and hopelessly derail the central fact-finding task.

---

[1]Although, as noted, the majority does make clear at places in the opinion that a prosecutor must request instruction on the "natural and probable consequences" doctrine, and must further advise the court of the target offense or offenses on which it is relying on (maj. opn., *ante*, at pp. 267, 269), the majority still label the duty placed on the trial court under the *holding of this case* as a "sua sponte" one (*id.* at p. 269), and unfortunately, *several passages* remain in the majority opinion which might mistakenly be read to suggest that the trial court's duty to instruct under today's holding is a sua sponte duty in the classic sense of that term (*id.* at p. 266).

Two analytical mistakes undermine the majority's rationale. First, the opinion fails to recognize that particularized evidence, not a general theory of liability, triggers the duty to instruct sua sponte. Second, it ignores the critical role of causation.

This court summarized the generic standard applicable to a trial court's sua sponte duty in *People* v. *Wickersham* (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d 311] (disapproved on other grounds in *People* v. *Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531]): " ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citation.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions [on a particular rule of law] when the evidence raises a question as to whether [that rule applies to the facts], but not when there is no evidence [to which it might apply].' "

The duty to instruct sua sponte always extends to certain fundamentals: elements of the charged offense, any required specific intent, the prosecution's burden of proof. (See also *People* v. *Putnam* (1942) 20 Cal.2d 885, 890-891 [129 P.2d 367], disapproved on other grounds in *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 882 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845].) In most other circumstances, however, the court's obligation turns on an intensely fact-bound and case-specific inquiry. (See *People* v. *Daniels* (1991) 52 Cal.3d 815, 885 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Kimble* (1988) 44 Cal.3d 480, 503 [244 Cal.Rptr. 148, 749 P.2d 803]; cf. *People* v. *Geiger* (1984) 35 Cal.3d 510, 531 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055] [instruction on lesser related offense requires evidentiary basis for jury to find crime was less than that charged].) Hence, the court need only "give instructions whose necessity is '*developed through the evidence introduced at trial.*' [Citation.]" (*People* v. *Putnam, supra*, 20 Cal.2d at p. 890, italics added.)

For example, in *People* v. *Tidwell* (1970) 3 Cal.3d 82, 85 [89 Cal.Rptr. 58, 473 P.2d 762], "defendant raised the defense of diminished capacity *by testifying*" to facts that, if believed, would establish his intoxication at the time of the crimes. (Italics added.) That *evidence* "required instructions which would have fully presented the defense of diminished capacity to the jury." (*Id.* at pp. 85-86.) In *People* v. *Sedeno* (1974) 10 Cal.3d 703, 714 [112 Cal.Rptr. 1, 518 P.2d 913] (disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]),

the defense theory was also diminished capacity as *"suggested by the evidence."* (Italics added; see also *People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390] [trial court must instruct on diminished capacity "where there is substantial evidence that the defendant is relying upon such defense"].)

In *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370], the defendant was charged with assault with a deadly weapon upon a police officer. In determining whether the trial court had a sua sponte duty to instruct on the lesser included offense of assault with a deadly weapon, the court had to determine "whether *the evidence in this case* clearly indicated [the officer] might not have been engaged in the performance of his duties or that defendant might not have known or had reason to know that he was so engaged." (*Id.* at p. 450, italics added.) In other words, the duty to instruct arose not from the nature of the charge in the abstract but from the particular facts adduced at trial raising the possibility of a factual defense. In *People* v. *Bevins* (1960) 54 Cal.2d 71, 77 [4 Cal.Rptr. 504, 351 P.2d 776], "the *testimony as to the circumstances* surrounding the manner in which defendant's confession was obtained was in direct conflict, thus [requiring the trial court] to submit to the jury for its determination under proper instructions the question whether *under all the circumstances* the confession was made freely and voluntarily." (Italics added; see also *People* v. *Wilson* (1967) 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820] ["Under the evidence here presented, instructions on [brandishing a weapon] were closely and openly connected with the facts before the court."]; *People* v. *Wade* (1959) 53 Cal.2d 322, 335 [1 Cal.Rptr. 683, 348 P.2d 116] ["facts of the instant case" did not require or justify instruction on lesser included offense].)

Imposing a duty to "identify and describe the elements" of the target offense(s) in all cases involving a natural and probable consequences theory of accomplice liability neither comports with the general rule nor conforms to applicable case law. Focus on the target offense is logically necessary only when the evidence supports an inference the defendant facilitated or encouraged *non*criminal conduct. (*People* v. *Solis* (1993) 20 Cal.App.4th 264, 274, fn. 8 [25 Cal.Rptr.2d 184]; see, e.g., *People* v. *Mouton* (1993) 15 Cal.App.4th 1313, 1320-1321 [19 Cal.Rptr.2d 423].) In other words, additional explanation is warranted only when one reasonable determination of the facts might legally exonerate the defendant. (Cf. *People* v. *Failla* (1966) 64 Cal.2d 560 [51 Cal.Rptr. 103, 414 P.2d 39].) In most instances, however, the evidence leaves no room for doubt. Thus, "the facts before the court" would not warrant further instruction. (*People* v. *Wickersham, supra,* 32 Cal.3d at p. 323.)

In *People* v. *Failla, supra,* 64 Cal.2d 560, the defendant was charged with burglary, but "the evidence presented" was ambiguous and "subject to [the]

inference not only that defendant intended to commit one or more felonies . . . , but also intended to commit one or more misdemeanors . . . or acts which are not crimes" (*id.* at p. 565), in which event the jury was bound to acquit. In these circumstances, this court concluded the definition of "felony" was " 'closely and openly connected with the facts of the case' " and should have been given sua sponte by the trial court. (*Ibid.*) The duty arose, however, only upon evidence permitting a factual finding favorable to the defendant. (*Id.* at p. 564.)

By a parity of reasoning, in a case of natural and probable consequences liability, the opportunity for the jury to "indulge in unguided speculation" does not present itself when the antecedent conduct is clearly criminal. (*People* v. *Failla, supra,* 64 Cal.2d at p. 564.) Here, the majority concedes "[t]here was no evidence of any other possible 'target' apart from Prettyman's assault on Van Camp, *an act that was indisputably criminal.* There was *no evidence that Bray aided and abetted any noncriminal behavior* which led, as a 'natural and probable consequence,' to Prettyman's murder of Van Camp . . . ." (Maj. opn., *ante,* at p. 273, italics added.) Since the criminality of Prettyman's precedent acts was not open to reasonable doubt, the particulars of the target offense(s) became superfluous and irrelevant. (See *People* v. *Solis, supra,* 20 Cal.App.4th at p. 275.) As in most cases, they were not "closely and openly connected to *the facts* before the court . . . ." (*People* v. *Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903], italics added.)

The additional instruction will not only fail to enlighten, it will distract from the jury's more fundamental determination: the causal nexus between the intended or perpetrated target offense and the ultimate crime. (See *People* v. *Solis, supra,* 20 Cal.App.4th at pp. 275-276.)

The majority's second analytical misstep is its failure to consider causation. To this end, some historical perspective is helpful. The natural and probable consequences theory of aider and abettor liability traces its ancestry more than 400 years back to *The Queen* v. *Saunders & Archer* (1576) 75 Eng.Rep. 706. Wishing to murder his wife, Saunders procured poison from one Archer and inserted it in an apple, which he gave to his wife upon Archer's advice. She gave the apple to their young daughter, who ate it and died. Although Saunders's guilt was readily predicated on the doctrine of transferred intent, the question arose whether Archer incurred any criminal liability for his part in the scheme. Even at the time, aiders and abettors were for the most part treated as principals under the law. However, "Archer did not precisely procure [the daughter's] death, nor advise [Saunders] to kill her, and therefore whether or no he should be accessary to this murder which

happened by a thing consequential to the first act, seemed . . . doubtful." (*Id.* at p. 709.)

"Plowden, at the conclusion of his report of the case, sets forth a comprehensive note stating his view of the law; and this note, as echoed and reiterated by subsequent writers down through the centuries, has furnished the foundations of the criminal law upon the subject with comparatively little change even to our own day." (Sayre, *Criminal Responsibility for the Acts of Another* (1930) 43 Harv. L.Rev. 689, 697-698, fns. omitted; hereafter Sayre.) "Plowden's note is as follows: 'Note, it seems to me reasonable that he who advises or commands an unlawful Thing to be done shall be adjudged Accessary to all that follows from that same Thing, but not from any other distinct Thing. As if I command a Man to rob such a one, and he attempts to rob him, and the other defends himself, and a Combat ensues between them, and the Person attempted to be robbed is killed, I shall be Accessary to this Murder, because when he attempted to rob him, he pursued my Command, and then when he pursued my Command, and in the Execution thereof another Thing happened, I ought in Reason to be deemed a Party therein, because my Command was the Cause of it. So if I command one to beat another, and he beats him so that he dies thereof, I shall be Accessary to this Murder, for it is a Consequence of my Command, which was the original Foundation thereof, and which naturally tended to endanger the Life of the other. . . .' " (*Id.* at p. 698, fn. 37.)

The early law incorporated the rationale of Plowden's note as well as similar principles previously set forth by Staunford in his *Pleas of the Crown* in 1557. (Sayre, *supra*, 43 Harv. L.Rev. at p. 699.) It continued "with surprisingly little change through the barren centuries following," being reiterated essentially intact by Coke (1644), Hale (1678), Hawkins (1716), and Blackstone (1769). (Sayre, *supra*, 43 Harv. L.Rev. at p. 699, fn. omitted.) "Hawkins' only original contribution is a caution against extending the liability of the accessory too far, perhaps prompted by the fear that the doctrine [of respondeat superior] then being initiated by Lord Holt in the law of torts should obtain a hold upon the criminal law." (*Ibid.*, fns. omitted.) Several years later, the court in *Rex* v. *Huggins* (1730) 2 Strange 882 expressly refused to apply agency principles to the criminal law. (Sayre, *supra*, 43 Harv. L.Rev. at pp. 700-701.)

"It is not surprising, therefore, that courts today as a general rule . . . make criminal liability exclusively dependent upon causation." (Sayre, *supra*, 43 Harv. L.Rev. at p. 702.) Accordingly, "even if the particular criminal act has not been authorized or consented to, if it grows out of and is the proximate consequence of one that has been authorized or procured, the

defendant is criminally liable . . . ." (*Id.*, at pp. 703-704, fn. omitted.) In this manner, the law has maintained criminal responsibility commensurate with culpability. (*People* v. *Luparello* (1986) 187 Cal.App.3d 410, 439 [231 Cal.Rptr. 832]; cf. *People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130] [felony-murder rule limited to killings "committed by the defendant or by his accomplice acting in furtherance of their common design" to avoid further eroding "relation between criminal liability and moral culpability"]; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 20 [9 Cal.Rptr. 607, 357 P.2d 839] [statutory limitation on multiple punishment to ensure defendant's "punishment will be commensurate with his criminal liability"].) Deeply rooted in the common law, this causative theory of aider and abettor liability remains the standard. Indeed, some jurisdictions have incorporated it into their statutory definitions of accomplices. (See 1 Wharton's Criminal Law (15th ed. 1993) Parties, § 35, pp. 209-210; see also, e.g., Me. Rev. Stat. Ann. tit. 17-A § 57(3)(A); Minn. Stat. Ann. § 609.05(2).)

In California, *People* v. *Kauffman* (1907) 152 Cal. 331, 334-335 [92 P. 861], contains one of the first extensive discussions, but the principles were recognized well before. Our decision in *People* v. *Keefer* (1884) 65 Cal. 232 [3 P. 818], does not expressly refer to the "natural and probable consequences" theory of accomplice liability. The analysis, however, manifestly ratifies its rationale premised on a fact-specific assessment of causation: "In the case at bar, if defendant simply encouraged the *tying* of the deceased—a misdemeanor which did not and probably could not cause death or any serious injury—as the killing by Chapman was neither necessarily nor probably involved in the battery or false imprisonment, nor incidental to it, but was an independent and malicious act with which defendant had no connection, the jury were not authorized to find defendant guilty of the murder, or of manslaughter. If the deceased had been strangled by the cords with which he had been carelessly or recklessly bound by Chapman, or had died in consequence of exposure to the elements while tied, defendant might have been held liable. But, if the testimony of defendant was true—and as we have said, he was entitled to an instruction based upon the assumption that the facts were as he stated them to be—the killing of deceased was an independent act of Chapman, neither aided, advised, nor encouraged by him, and not involved in nor incidental to any act by him aided, advised, or encouraged." (*Id.* at pp. 233-234, italics in original.)

Until today, modern decisions remained grounded in the historical rationale of causation. "[A] defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the

intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator." (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392]; see *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318]; *People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198].) "[The] derivative criminal liability of an aider and abettor centers on causation." (*People* v. *Brigham* (1989) 216 Cal.App.3d 1039, 1052 [265 Cal.Rptr. 486]; see *id.* at pp. 1050-1051, 1056, fn. 13; *People* v. *Solis*, *supra*, 20 Cal.App.4th at p. 271; *People* v. *Luparello*, *supra*, 187 Cal.App.3d at p. 440.) "This is a question of legal causation independent of any intention that the result obtain." (*People* v. *Rogers* (1985) 172 Cal.App.3d 502, 515 [217 Cal.Rptr. 809]; *People* v. *Butts* (1965) 236 Cal.App.2d 817, 837 [46 Cal.Rptr. 362].)

Causation is the pivot around which natural and probable consequences liability turns, requiring—like the sua sponte duty to instruct—a fact-specific analysis. (See *People* v. *Durham*, *supra*, 70 Cal.2d at p. 181.) Identifying and describing the elements of the predicate offense(s) in the abstract cannot assist that inquiry because the answer to whether crime "x" was a natural and probable consequence of advising, encouraging, or facilitating crime "y" will always be: It depends. (See, e.g., *People* v. *Keefer*, *supra*, 65 Cal. at pp. 233-234.) "[T]he legal elements of the predicate offense are irrelevant to the determination of whether the ultimate crime was a natural and probable consequence of the predicate. Whether there is a nexus of foreseeability between the predicate and the perpetrated offense depends not on crime definitions but on the specific *facts* of each offense." (*People* v. *Solis*, *supra*, 20 Cal.App.4th at pp. 273-274.) "The determination whether a particular criminal act was a natural and probable consequence of another criminal act aided and abetted by a defendant requires application of an objective rather than subjective test. [Citations.] This does not mean that the issue is to be considered in the abstract as a question of law. [Citation.] Rather, the issue is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident." (*People* v. *Nguyen* (1993) 21 Cal.App.4th 518, 531 [26 Cal.Rptr.2d 323].)[1] Causation not only supersedes abstract consideration of the target offense(s), it renders identification and

---

[1]See, e.g., *People* v. *Creeks* (1915) 170 Cal. 368, 375 [149 P. 821] (killing of prison guard was natural and probable consequence of escape plan, which contemplated overcoming guards by whatever force necessary); *People* v. *Nguyen*, *supra*, 21 Cal.App.4th at pp. 529-534 (sex offenses were natural and probable consequence under circumstances of planned robberies); *People* v. *Butts*, *supra*, 236 Cal.App.2d at pp. 836-837 (no aiding and abetting liability because no causal nexus between defendant's joining in brawl and victim's death where defendant did not know assailant was armed with knife); *People* v. *Simpson* (1944) 66 Cal.App.2d 319, 328 [152 P.2d 339] (aider and abettor liability for unplanned kidnapping that was one of "a variety of ways" planned robbery could be committed); *People* v. *King* (1938)

description of the elements immaterial to the question of natural and probable consequences. The trial court here thus did not err in failing sua sponte to modify CALJIC No. 3.02 (5th ed. 1988).

The pattern instruction may, however, suffer a deficiency more directly related to the jury's central inquiry. Currently, "natural and probable consequences" is nowhere defined; juries receive no explication of causation, the fundamental rationale for imposing criminal responsibility. The more attenuated cause and effect, the less compelling the case for finding derivative liability. The analytical measure must be more exacting than a hindsight determination that the actual, if unintended, consequence was not unforeseeable. Nor is a strict but-for test appropriate; a mere chain of events will not suffice.

In *Roy* v. *United States* (D.C. 1995) 652 A.2d 1098, 1105, the Court of Appeals for the District of Columbia considered the scope of its accessory liability standard—comparable to our own—for " 'any criminal act which in the ordinary course of things was the natural and probable consequence of the crime that [the defendant] advised or commanded, although such consequence may not have been intended by him.' [Citations.]" The court explained, "The phrase 'in the ordinary course of things' refers to what may reasonably ensue from the planned events, not to what might conceivably happen, and in particular suggests the absence of intervening factors. 'Natural' has many meanings, but the most apposite dictionary definition is 'in accordance with or determined by nature.' A natural consequence is thus one which is within the normal range of outcomes that may be expected to occur if nothing unusual has intervened." (*Ibid.*, fns. omitted.) "Intervention in this sense may refer not only to physical happenings but also to mental events, such as an inexplicable shift of mind unrelated to the original plan." (*Ibid.*, fn. 15.) "We need not define 'probable,' except to note that, even standing alone, this adjective sets a significantly more exacting standard than the word 'possible.' Accordingly, if we accord to the words of our cases their ordinary everyday meaning, it is not enough for the prosecution to show that the accomplice knew or should have known that the principal might conceivably commit the offense which the accomplice is charged with aiding and abetting. Without inserting additional phrases or adjectives into the calculus, we think that our precedents require the government to prove a good deal more than that. A 'natural and probable' consequence in the 'ordinary course of things' presupposes an outcome within a reasonably predictable range." (*Id.* at p. 1105.)

30 Cal.App.2d 185, 200 [85 P.2d 928] ("character of the plan is of great importance" in determining whether defendant liable for unintended killing resulting from knowingly encouraged assault); see also *People* v. *Kauffman, supra*, 152 Cal. at pp. 335-337; cf. *State* v. *Bridges* (1992) 254 N.J.Super. 541, 555 [604 A.2d 131, 139].

The majority holding yields no such guidance. Indeed, it compounds the problem by placing its imprimatur on the 1992 revision of CALJIC No. 3.02. The majority declines to decide "whether a defendant may be convicted under the 'natural and probable consequences' doctrine when the target criminal act was not committed." (Maj. opn., *ante*, at p. 262, fn. 4.) Nevertheless, by its terms this version of CALJIC No. 3.02 directs that the jury "must be satisfied beyond a reasonable doubt that" a coprincipal actually committed a predicate crime the defendant aided and abetted. Without apparent judicial support, the CALJIC committee departed radically from the language of prior formulations, which referred only to "the crime originally *contemplated*" and "such originally *contemplated* crime." (CALJIC No. 3.02 (5th ed. 1988) italics added; see also CALJIC No. 3.00 (4th ed. 1987 pocket pt.) ["the particular crime . . . confederates are contemplating"; "crime allegedly contemplated"]; CALJIC No. 3.00 (4th ed. 1984) ["the particular crime . . . confederates are contemplating"]; CALJIC No. 3.00 (3d ed. 1976 pocket pt.) [same].)

The earlier versions hewed more faithfully to both the decisional and statutory authority undergirding the natural and probable consequence theory of accomplice liability. "It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal *was intended*, and his action taken *with the intent that the act be encouraged or facilitated*, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *Beeman* holds must be found by the jury. [Citation.]" (*People* v. *Croy*, *supra*, 41 Cal.3d at p. 12, fn. 5, italics added; see also Pen. Code, § 31; *People* v. *Durham*, *supra*, 70 Cal.2d at p. 181; *People* v. *Villa* (1957) 156 Cal.App.2d 128, 134 [318 P.2d 828]; cf. *People* v. *Kauffman*, *supra*, 152 Cal. 331 [victim killed on return from uncommitted burglary defendant aided and abetted].)

Instead of clarifying the doctrine of natural and probable consequences, these new instructional requirements will vex trial judges and perplex juries. The former, who previously had the option of utilizing the unrevised version of CALJIC No. 3.02 (5th ed. 1988), will search in vain for a limiting principle; the latter will understandably wonder if they can convict an aider and abettor of an ultimate crime if the predicate was never completed. Moreover, the burden on trial judges to divine how to "describe" elements of the target offense(s) has no offsetting benefit and the rule offers no real guidance. In what manner does a "description" differ from a "definition"?

(See *People* v. *Mouton, supra,* 15 Cal.App.4th 1313, 1318; see also CALJIC No. 3.02 (5th ed. pocket pt.) (1992 rev.).) If not stated in terms of constituent elements, how elaborate must the description be? Is a "nonunanimity" instruction required? (See *People* v. *Solis, supra,* 20 Cal.App.4th at p. 275.)

Busy trial courts have long labored to keep pace with the proliferation of instructional duties imposed by appellate courts. More than three decades ago, in a case reversed for failure to give an instruction on diminished capacity, Justice Gardner justifiably lamented the "ever-expanding law of *sua sponte* instructions," which does little to improve the quest for justice in the trial courts while frequently generating an argument for reversal on appeal. (*People* v. *Rodriguez* (1969) 274 Cal.App.2d 487, 494 [79 Cal.Rptr. 187].) Illustrating his point, he noted that a consultant for the CALJIC committee had recently compiled "a miscellaneous list of *sua sponte* instructions which was not intended to be exhaustive," but "contain[ing] approximately 114 situations in which the appellate courts have indicated that the giving of certain instructions was mandatory." (*Ibid.,* fn. 1.) Today, the majority needlessly contributes to what is now undoubtedly a much longer list already teeming with the potential for reversible error. (See Cal. Judges Benchguide S216: Mandatory Criminal Jury Instructions (4th ed. 1988).) Anticipating the natural and probable consequences, I decline to encourage or facilitate that enterprise.