Filed 9/26/13  P. v. Smith CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B243917 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA079326) |
| v. | |
| ART L. SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Robert P. O'Neill, Judge.  Affirmed.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Art Smith appeals from a judgment entered after a jury found him guilty of robbery and found true firearm enhancement (Pen. Code, §§ 12022, subd. (a)(1), 12022.53, subds. (b) & (e)(1)),[1] and gang enhancement (§ 186.22, subd. (b)(1)(C)) allegations.  The trial court sentenced Smith to 12 years in prison.  Smith contends there is insufficient evidence supporting the robbery conviction and the true finding on the gang enhancement.  We disagree with Smith's contentions and affirm.

## BACKGROUND

On November 25, 2011, the day after Thanksgiving, robbery victim Michael Bush[2] was walking to work westbound on the sidewalk along Jefferson Boulevard in Culver City.  He was carrying a backpack, a cellular telephone in a case on his hip, a wallet in his back pocket, and an iPod in another pocket.  He was wearing earphones because he was listening to music on his iPod.

Between 10:00 and 11:00 a.m., Bush noticed a "bright red" Pontiac car with two men inside traveling eastbound on Jefferson Boulevard in the lane closest to the sidewalk where Bush was walking.  As the car drove by, the passenger, who was about 15 feet away from Bush, turned his whole body to face Bush and stared at Bush.  At trial, Bush identified the passenger as defendant Smith.

Bush continued walking westbound on Jefferson Boulevard.  As he approached the intersection of Jefferson and Kinston Street, he saw the driver of the red car and Smith outside of the parked car.  Smith was wearing a blue sweatshirt, blue hat and black pants.  The driver was wearing "a Baldwin Park shirt" and "baby-bluish type pants."  It appeared to Bush that the driver was getting ready to walk across Kinston Street on Jefferson, just as Bush was about to do.  Smith was walking toward the driver.  Bush walked past the two men.  Bush made eye contact with Smith, nodded at him, and said, "What's up."  Neither Smith nor the driver responded to Bush.

---

[1] Statutory references are to the Penal Code.

[2] Bush testified at trial and described the robbery.

2

Bush walked across Kinston Street at a crosswalk on Jefferson. He reached the sidewalk on the other side of the street and continued walking along Jefferson. After Bush walked a few more feet away from the crosswalk, Smith walked past Bush about an inch or two from Bush's left side. Smith did not acknowledge Bush. Smith then positioned himself in front of Bush, and maintained a steady walking pace so that he remained about five feet in front of Bush. Smith and Bush walked in this formation for about 30 seconds.

Then, the driver of the red car walked up on Bush's left side and asked Bush, "Hey, Blood, where are you from?" Bush turned to his left to look at the driver and he lost sight of Smith (and never saw Smith again that day). Bush understood that the driver was asking him if he belonged to a gang, and Bush told the driver he did not. Bush walked a couple more feet until the driver ordered Bush to empty his pockets and showed Bush that he had a gun tucked into the waistband of his pants. The driver told Bush to place his belongings on the ground and then continue walking. Bush stopped in the driveway of a shopping plaza to empty his pockets. The driver continued walking until he reached a nearby bus stop and sat down on a bench. One at a time, Bush removed his Samsung Galaxy S1 cellular telephone, iPod and wallet and placed each item on the ground. As Bush walked away past the driver, Bush said, "'God Bless. I hope this gets you far.'" The driver responded, "'All right, Blood.'"

Bush walked to a store about a block away and contacted the police. Officers responded to the store and Bush gave a statement about the crime.

On November 26, 2011, the day after the robbery, a couple of telephone calls were made from Bush's stolen Samsung Galaxy S1 cellular telephone. The calls came from Smith's cellular telephone number because a SIM card linked to Smith's cellular telephone account was placed in Bush's stolen phone.[3]

---

[3] An employee from the legal department of wireless telephone provider T-Mobile testified at trial about the origin of these November 26, 2011 telephone calls.

On November 30, 2011, Bush met with Detective Ryan Thompson, the investigating officer on this case, at the police station in Culver City. Detective Thompson showed Bush a six-pack photo lineup. Bush circled a photograph, identifying the passenger who had stared at him from the red car and then acted as a "lookout" during the robbery (Smith).

Also on November 30, 2011, officers from the Culver City Police Department went to Palmdale to look for Smith because his residence was in Palmdale. The officers located and arrested Smith in Palmdale. The officers searched Smith and found a T-Mobile Sidekick cellular telephone. Detective Thompson called the phone number associated with the SIM card placed in Bush's stolen phone the day after the robbery. The call rang through to the cellular telephone in Smith's possession at the time of his arrest.

About 20 minutes after Smith's arrest, Detective Thompson and other officers from the Culver City Police Department executed a search warrant at Smith's residence in Palmdale. Detective Eric Shimabukuro searched Smith's bedroom and found a Blackberry cellular telephone, an SD memory card and a receipt from a T-Mobile store with Smith's cellular telephone number on it. Detective Thompson took photographs of these items and also what he believed to be "gang writings" on the door and other surfaces in Smith's bedroom (the letters "HTF," "ESBSV," and "FLIP" were written in red and blue, and the letters "BSV" also appeared). Thompson also took a picture of shoes with red shoelaces found in Smith's bedroom.[4]

Smith was transported to the police station in Culver City where Detective Thompson interviewed him that same day (November 30, 2011).[5] During the interview, Smith initially denied he was in Culver City on November 25, 2011, and also denied he

---

[4] Detectives Thompson and Shimabukuro both testified at trial.

[5] An audiotape from the interview was played for the jury at Smith's trial. A transcript of the recording was received in evidence and is included in the Clerk's Transcript on appeal.

4

had possessed Bush's stolen Samsung Galaxy cellular telephone. After Detective Thompson revealed that a SIM card Smith purchased was placed in Bush's stolen phone, Smith stated he purchased the Samsung Galaxy phone from a man in Palmdale on November 25, 2011, and then traded the phone to another man in Palmdale the same day in exchange for the Sidekick phone he had on his person when he was arrested. After Detective Thompson told Smith that Bush identified him as being involved in the robbery, Smith admitted that a man named "Menace" drove Smith to Culver City. According to Smith, Menace first drove Smith to purchase marijuana, and then Smith smoked some of the marijuana, before Menace drove to Culver City. Detective Thompson asked Smith if Menace was a Blood or a Crip and Smith responded: "He don't bang on me but he was saying Blood a lot."

Smith told Detective Thompson that Menace robbed Bush and he (Smith) was not part of it. According to Smith, Menace saw Bush walking as they were driving by in Menace's red car. Menace turned the car around and parked. Menace exited the car and walked to the traffic light. Menace motioned for Smith to follow him and Smith did. When Smith got to the light, Menace already was walking away. Smith caught up to Menace and walked past him. When Smith turned around, he saw Menace with Bush. When he realized Menace was robbing Bush, Smith went into a clothing store and waited for about 15 seconds. When Smith exited the store, he did not see Bush. As Menace and Smith returned to the car, Smith noticed Menace was carrying a gun in the waistband of his pants. Later that day, Smith purchased Bush's stolen Samsung Galaxy phone from Menace for $30. He traded it to another man for the Sidekick phone.

During the interview, Detective Thompson told Smith he knew Smith was "from FLIP" (which stands for the gang, "Fuck Love, I'm Pimping") because Smith had FLIP "tagged all over [his] whole bedroom." Smith stated that FLIP had not existed for the past two years. Thompson asked Smith about his moniker, "Twin Fatal." Smith stated he was given that name by a man named "Big Fatal" from Hawthorne Thug Family

5

(HTF).  Smith stated he believed Big Fatal was associated with the Crips gang.[6]  Smith denied any current gang affiliation.

As part of his investigation, Detective Thompson analyzed information on the Blackberry cellular telephone found in Smith's bedroom during the search.  Thompson testified about a report including more than 140 pages of text messages which were sent from and received by the Blackberry phone in the 22 days leading up to Smith's arrest (from November 8 to November 30, 2011).  In those text messages, Smith used the term "Blood" twice.  In an outgoing message on November 24, 2011, he referred to someone as "Blxxd."[7]  In a response to the same person, Smith referred to himself as "Art Blxxd Twin Fatal."  A couple of women used the term "Blood" once or twice in incoming messages received on the Blackberry phone.  Detective Thompson testified about a couple of other text messages sent from the Blackberry in which Smith referred to himself as Twin Fatal.

Detective Thompson also analyzed information on the Samsung Sidekick cellular telephone—the phone found on Smith's person at the time of his November 30, 2011 arrest.  Thompson testified about a report including about 42 pages of text messages sent from and received by the Sidekick phone from November 26 to November 30, 2011.  Smith did not use the term "Blood" in any of the outgoing text messages, and no one used the term "Blood" in any of the incoming text messages.  Detective Thompson testified about four text messages sent from the Sidekick phone in which Smith referred to himself as Twin Fatal.

Detective Thompson also testified about information on the SD memory card found in Smith's bedroom during the search.  There was a photograph of the words

---

[6] At trial, Detective Thompson testified that he believed HTF was a gang which was "more affiliated with Bloods" than with Crips, but was essentially neutral.

[7] The prosecution's gang expert testified:  "Blood gangs will cross out the zeroes or the o's in 'Blood' because there are Crip sets known as the o's or the hundreds and they have 30's, 60's, 90's, hundreds all have the zeroes and that essentially are their enemies, so they cross those out."

"Twin Fatal" written in the snow. There also were photographs of Smith wearing hats, including a Chicago Bulls hat, an orange baseball cap, and a red and gold 49ers hat.

Also found on the SD memory card was a video taken on May 20, 2011 at a party.[8] During the video, an unidentified female states, "I wanna be a Fatal." An unidentified male states, "fuck NAPS" (a reference to Neighborhood Crips). Smith identifies himself as "T.F." Smith also states, "Seventh Grade been from Fatal . . . ." Another unidentified male responds, "Hey you said you've been from Fatal? Feel me, we out here (unintelligible) this the house right here. . . . [W]e all in there, there's a gang of us all in here. We outside on the stairs smoking cigarettes." This unidentified male also refers to Big Fatal, and then states: "Twin Fatal (unintelligible). Twin Fatal . . . my twin, he is trying to be like Big Fatal, he just wanna pop pills, drink and smoke. (Unintelligible) you can't do everything. Oh Little Fatal just, Little Fatal, he went to the store, he got a bag, Little Fatal. . . ."

Daniel Welle, a deputy from the gang unit of the Los Angeles County Sheriff's Department, Lancaster station, testified as the prosecution's gang expert. Welle had not had personal contact with Smith, but he spoke to another deputy who had contacted Smith in the field in Palmdale on April 11, 2011. The other deputy filled out a field identification card indicating that Smith was a "self-admitted" member of FLIP who was wearing "gang attire" on April 11, 2011.

Deputy Welle testified that FLIP "started off as a dance crew" in or about 2006 or 2007. Shortly thereafter, members of FLIP began associating with the Antelope Valley gang "Bloods on Point" to gain "protection and to increase their numbers." Then FLIP "became a subset of Bloods on Point." Welle acknowledged that some members of FLIP did not join Bloods on Point (BOP) and some members of FLIP "completely disassociated." According to Welle, there were 12 to 15 identified members of FLIP. Welle testified that, at the time of the robbery in this case, FLIP was still in existence. At

---

[8] The video was played for the jury at Smith's trial. A transcript of the video was received in evidence and is included in the Clerk's Transcript on appeal.

the time of trial, law enforcement was aware of more than 450 members of BOP. BOP's primary activities were drug dealing, assaults, shootings, robberies and burglaries. Welle testified about felonies committed by two BOP members (assault with a firearm and robbery). Like other Bloods gang members, BOP and FLIP members wore red and "hats with the Boston B." Crips gangs and BOP were rivals.

Deputy Welle presented his opinion that Smith was an active member of FLIP, a subset of BOP. He based his opinion on the field identification card discussed above and evidence recovered from Smith's room—photos on the SD memory card of Smith in red hats and an orange hat with a B on it; the photo of the shoes with red shoelaces; photos of the writings in Smith's room which include the names of various Bloods gangs and gangs that were affiliated with Bloods gangs, including FLIP, and crossed-out references to Crips gangs.

Based on a hypothetical question by the prosecutor which tracked the facts of this case, Deputy Welle opined that the robbery was committed in association with and for the benefit of a Bloods criminal street gang. According to Welle, only a Bloods gang member would refer to someone as "Blood" in this context—when approaching a stranger and potential robbery victim. Welle also testified: "Essentially the gang hit-up serves multiple purposes. You have -- it gives you the time to determine, one, if the person that you're coming up to is either a member of your gang, albeit from a subset like we've been talking about, from an allied gang, maybe some sort of affiliate of either of those or a victim, or an enemy gang. It gives them time to decide whether or not they're going to commit the crime."

The jury found Smith guilty of second degree robbery. (§ 211.)[9] The jury also found true the special enhancement allegations that a principal was armed with a firearm (§ 12022, subd. (a)(1)), a principal used a firearm (§ 12022.53, subds. (b) & (e)(1)), and the robbery was committed for the benefit of, at the direction of, or in association with a

---

[9] Smith also was charged with receiving stolen property, but during trial the court granted the prosecution's motion to dismiss that count.

8

criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)).

The trial court sentenced Smith to 12 years in prison: the low term of two years for the robbery plus 10 years for the firearm enhancement under section 12022.53, subdivisions (b) and (e)(1).

## DISCUSSION

### Sufficiency of Evidence of Robbery

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The prosecution tried the case against Smith on the theory he aided and abetted the robbery.

"[A] person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator." (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, citing § 31.) "[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 259.) "[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

Smith contends there is insufficient evidence establishing he aided and abetted the robbery. "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same

effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  [Citation.]  . . .  ""'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."'  [Citations.]'"  [Citation.]"  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Substantial evidence demonstrates Smith aided and abetted the robbery.  He arrived at the scene with the perpetrator of the robbery.  Smith scoped out the victim from the car, turning his whole body to stare at Bush.  Smith positioned himself in front of Bush immediately before the robbery and maintained a steady pace as he walked in front of Bush.  Reasonable inferences from this evidence are that Smith acted to intimidate Bush, to prevent Bush from escaping once Bush realized he was being robbed, and to serve as a lookout while his associate committed the robbery.  (See *People v. Campbell*, *supra*, 25 Cal.App.4th at p. 409 ["the jury could reasonably conclude that Smith assumed his position in front of [the victims] to intimidate and block them, divert suspicion, and watch out for others who might approach.  Such conduct is a textbook example of aiding and abetting"].)  After the robbery, Smith returned to the car with the perpetrator.  The next day, Smith was in possession of and used Bush's stolen cellular telephone.  Substantial evidence establishes Smith knowingly supported the commission of the robbery.

**Sufficiency of Evidence of Gang Enhancement**

The jury found true the special allegation that the robbery was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members within

the meaning of section 186.22, subdivision (b)(1)(C). Smith contends there is insufficient evidence supporting the true finding on the gang enhancement because (1) there were insufficient facts "from which [Deputy] Welle could [discern] whether [Smith] and the driver, Menace, were acting on their own behalf in robbing Bush or on the behalf of a 'Blood' gang," and (2) "the prosecution presented no evidence of what Blood gang, if any, Menace was in and Welle in his opinion stated only that the robbery was for what appeared to be Blood gangs in general." We apply the same substantial evidence test outlined above. (*People v. Romero* (2006) 140 Cal.App.4th 15, 18.) "To prove a gang allegation, an expert witness may testify about criminal street gangs. [Citation.]" (*Ibid.*)

Substantial evidence demonstrates this was a gang-related crime. The driver asked Bush where he was from, meaning what gang he claimed. The driver twice referred to Bush as "Blood." Deputy Welle, the prosecution's gang expert, explained that only a Bloods gang member would refer to someone as "Blood" in this context—when approaching a stranger and potential robbery victim. Thus, in committing this robbery, the driver claimed the Bloods criminal street gang.

Smith was a self-admitted member of FLIP. Deputy Welle testified that, at the time of the robbery, FLIP was a subset of BOP (Bloods on Point). The day before the robbery, Smith showed his allegiance to the Bloods in his text messages. He referred to himself as "Art Blxxd Twin Fatal." He also referred to someone else as "Blxxd." As discussed above, Deputy Welle testified that Bloods gang members cross out the o's in the word Blood as an attack on their enemies, the Crips.

Substantial evidence demonstrates Smith claimed an allegiance to Bloods criminal street gangs in general and not just to FLIP/BOP. The writings on the door and other surfaces in his room showed that he associated with multiple Bloods gangs and gangs affiliated with the Bloods, and that he considered the Crips his enemies. In his interview with Detective Thompson, Smith did not identify a particular clique that Menace (the driver) belonged to, but he admitted that Menace used the word "Blood a lot."

11

"[B]efore multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang . . . some sort of collaborative activities or collective organizational structure must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization." (*People v. Williams* (2008) 167 Cal.App.4th 983, 988.) "Evidence of gang activity and culture need not necessarily be specific to a particular local street gang as opposed to the larger organization." (*Id*. at p. 987.) Here, there is evidence Bloods gangs wear the same colors and attire (although neither Smith nor the driver was wearing such attire during the robbery) and share the same common enemy—the Crips. As stated above, substantial evidence demonstrates Smith associated with various Bloods gangs and affiliates and not just FLIP/BOP.

Although this is a close case, we find the true finding on the gang enhancement is supported by sufficient evidence demonstrating that Smith committed the robbery in association with a man he knew was a Bloods gang member and that Smith specifically intended to assist this gang member in criminal conduct. The prosecution was not required to prove "'specific intent to benefit the *gang*.'" (*In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1362 ["there was evidence that the defendant intended to commit crimes in association with persons he knew were gang members, and that he intended to aid and abet the other gang members in the robberies they committed. Thus, '[i]t was fairly inferable that he intended to assist criminal conduct by his fellow gang members'"].) It was for the jury to decide whether it believed Deputy Welle's testimony that only a Bloods gang member would use the term "Blood" in the manner in which the driver used it.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

MALLANO, P. J.

JOHNSON, J.