Filed 9/3/15  P. v. Cernogg CA2/3
Opinion after reinstatement

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B210684 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA085192) |
| v. | |
| JAMES RUSSELL CERNOGG, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Reversed and remanded.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found defendant and appellant James Russell Cernogg, Jr., guilty of first degree murder and found true gun and gang enhancement allegations. The prosecution's theory was Cernogg aided and abetted the first degree premeditated murder of Michael Pimental. The jury was therefore instructed they could find Cernogg guilty of murder as either a direct aider and abettor or under the natural and probable consequences doctrine. Our California Supreme Court, however, has found that an aider and abettor cannot be guilty of first degree premeditated murder under the natural and probable consequences doctrine. (*People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*).) Because we cannot determine beyond a reasonable doubt that the jury based its verdict on a valid theory, as opposed to the invalid natural and probable consequences doctrine, we reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Factual background.

On May 11, 2006, Camilo H. ("Dust") and Michael Pimental ("Rest")[1] were hanging out with friends, including Michael Morales. Later that night, around 9:30 p.m. or 10:00 p.m., Camilo and Pimental were tagging. Camilo wrote "Dust" on a wall.

Cernogg, who was on a bicycle, approached and asked why they were writing on the wall and where did they live.[2] Camilo told him, " 'My bad.' " Cernogg told Camilo and Pimental to " '[c]ome on' " with him. Camilo did not see Cernogg with a gun, but he thought he might have one. Cernogg "chirped" someone.[3] The first and second times Cernogg called, there was no answer, but the third time somebody answered. Cernogg said, " 'I got them right [here],' " and he was told to " '[h]old them right there.' "

---

[1]      At the time of these events Pimental was 15 and Camilo was 12.

[2]      At trial, Camilo identified Cernogg as the man on the bike.

[3]      "[C]hirping" is another term for direct connect communication. By pushing a button on a direct connect phone a person can instantly connect with another phone, similar to a walkie talkie. Evidence established that calls between direct connect phones linked to Cernogg and codefendant Jeffrey Martin were made around the time of the shooting.

2

Cernogg told Camilo, " 'I'm going to kill you and your mom.' " During this time, Cernogg did not claim a gang or reference the Elm Street Piru gang.

Within minutes, Jeffrey Martin came from the other side of the street. Camilo had seen Martin around and knew him as "Slick." Martin held a gun, which he covered with a rag. Without a word to anyone, including to Cernogg, Martin pointed the gun at Pimental, who said, " 'No, don't shoot.' " Standing no more than three feet away, Martin shot Pimental once in the head, killing him.

Leaving his bike at the scene, Cernogg ran. Martin walked away, but he and Cernogg went in the same direction. From photographs, Camilo identified Martin as the shooter and Cernogg as the man on the bike.[4]

Morales witnessed some of these events. Around 10:00 p.m., he went to look for his mother, who had gone to the store. He saw Camilo and Pimental, who looked worried. Morales noticed the word "Dust" on a wall, and he wondered if they had just put it there. He saw a African-American man on a bike approach Camilo and Pimental and say something to them. Morales asked Pimental if he had seen Morales's mother, and Pimental asked Morales to go with them. The man on the bike, however, asked Morales if he wanted " 'some problems, too' " and said, " '[y]ou better go back.' " The man pulled up his shirt to expose a gun.[5] The man also said something about teaching them a lesson: " 'I'm going to teach these little fools a lesson not to write in my hood again.' " At trial, Morales said he did see the person on the bike in court.

DNA samples were retrieved from the bicycle left at the scene of the crime. Cernogg was a possible contributor to the DNA. As to one DNA sample, one out of 24,940 African-Americans could have contributed to that DNA. As to a second DNA sample, one out of 15,140 African-Americans could have contributed to it.

---

[4]    In a subsequent live line-up, Camilo identified Martin as the shooter.

[5]    Morales testified he told the police that the man on the bike had a gun. But the parties stipulated that neither during his interview on May 13, 2006, nor in subsequent interviews, did Morales tell a detective that the man on the bike pulled up his shirt to display a gun.

Gang evidence was introduced that Martin was a member of the Elm Lane Piru gang and Cernogg was an associate of the gang. Based on a hypothetical modeled on the facts of this case, the People's gang expert testified that such a crime was committed for the benefit of, at the direction of, or in association with Elm Street Piru.

## II.     Procedural background.

Trial was by jury. On March 5, 2008, the jury found Cernogg guilty of first degree murder (Pen. Code, § 187, subd. (a)).[6] The jury found true principal gun use allegations (§ 12022.53, subds. (b), (c), (d), (e)(1)) and a gang enhancement allegation (§ 186.22, subd. (b)(1)(A)).[7]

On August 18, 2008, the trial court sentenced Cernogg to 25 years to life for the murder of Pimental plus an additional 25 years for the gun use enhancement (§ 12022.53, subds. (d), (e)(1)).

On December 9, 2009, we affirmed Cernogg's conviction in an unpublished opinion. (*People v. Cernogg* (Dec. 9, 2009, B210684) [nonpub. opn.].)

On April 16, 2015, we granted Cernogg's motion to recall the remittitur and to reinstate the appeal, based on *Chiu, supra,* 59 Cal.4th 155.

## DISCUSSION

## I.     Cernogg could not be guilty of first degree premeditated murder under a natural and probable consequences theory of aiding and abetting.

The jury was instructed it could find Cernogg guilty of first degree premeditated murder either as a direct aider and abettor or under the natural and probable consequences doctrine.[8] We find it was error, under *Chiu*, to instruct the jury on the natural and probable consequences doctrine. The People concede.

---

[6]     All statutory references are to the Penal Code.

[7]     The jury found Martin guilty of first degree murder and of related gun and gang enhancement allegations.

[8]     The jury was instructed on direct aiding and abetting (CALJIC No. 3.01) and on the natural and probable consequences doctrine (CALJIC No. 3.02.) False imprisonment was the target offense.

4

In *Chiu*, as here, the defendant was charged with murder. The prosecution argued that the defendant either directly aided and abetted a codefendant in the shooting death of the victim or the defendant aided and abetted his codefendant in the target offense of assault or of disturbing the peace, the natural and probable consequence of which was murder. In considering whether the natural and probable consequences instruction was error, *Chiu* first noted that "[a]ider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature." (*Chiu, supra,* 59 Cal.4th at p. 164.) Thus, the aider and abettor's liability depends not on his or her mens rea to commit the nontarget offense, but on the reasonable foreseeability of the actual resulting harm or the criminal act that caused that harm. This doctrine, in the context of murder, serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing such as second degree murder. (*Id.* at p. 165.)

This public policy concern "loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder." (*Chiu, supra,* 59 Cal.4th at p. 166.) This is because the mental state required for first degree murder is "uniquely subjective and personal," requiring "more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*Ibid.*) Thus, "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above[-]stated public policy concern of deterrence." (*Ibid.*) *Chiu* concluded that while second degree murder is "commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine," first degree premeditated murder is not. (*Ibid.*) For an aider and abettor to be convicted of first degree premeditated murder, he or she must be found liable as a direct aider and abettor. (*Id.* at pp. 166-167.)

Where, as here, a defendant possibly has been convicted of first degree premeditated murder under the natural and probable consequences doctrine, the conviction must be reversed unless the reviewing court can conclude beyond a reasonable doubt that the jury based its verdict on a legally valid theory. (*Chiu, supra,* 59 Cal.4th at p. 167; see also *People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129 [when a trial court instructs on two theories of guilt, one legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground].) A legally valid theory—direct aiding and abetting—was before the jury. But, as the People concede, we cannot determine beyond a reasonable doubt that the jury based its verdict on that theory, as opposed to the invalid natural and probable consequences doctrine. The People argued both theories to the jury and nothing in the record suggests on which theory the jury relied.

This matter must therefore be remanded. On remand, the People may accept a reduction of the first degree murder conviction to second degree murder or retry the defendant on the greater offense of first degree murder under a direct aiding and abetting theory of liability. (*Chiu, supra,* 59 Cal.4th at p. 168.)

As to direct aiding and abetting, we previously found that there was sufficient evidence to support that theory. To prove liability as a direct aider and abettor, the prosecution must show that the defendant "acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) The evidence here was that Martin was a known member of the Elm Street Piru gang, and Cernogg was an associate of the gang. On the night of Pimental's murder, Cernogg was riding his bike in gang territory. When he stopped Pimental and Camilo, he told them to come with him. Cernogg chirped Martin, who told Cernogg to "hold them" there. Cernogg followed Martin's orders. Cernogg stated his intent to Camilo: " 'I'm going to kill you and your mom.' "

That Cernogg intended harm is further evidenced by his threat to Morales, a friend of Pimental's and Camilo's who happened to wander by. Cernogg told Morales that

6

unless he too wanted " 'some problems,' " he had " 'better go.' " Cernogg lifted his shirt to reveal a gun and said something to the effect of, " 'I'm going to teach these little fools a lesson not to write in my hood again.' " This evidence is more than sufficient to show that Cernogg shared Martin's intent and purpose and to therefore allow a retrial under a direct aiding and abetting theory.

## DISPOSITION

The judgment is reversed and the matter is remanded. The People may accept a reduction of Cernogg's conviction to second degree murder. If, after the filing of the remittitur in the trial court, Cernogg is not retried within the time described in section 1382, subdivision (a)(2), the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of second degree murder and shall resentence Cernogg accordingly.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, J.


We concur:



EDMON, P. J.



LAVIN, J.

7